# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

DAVID POITIER BELTON, DEREK
MICHAEL MIMS, ANTON TARRICE
WHITNEY, JR., and ELMER MIMS,

           Defendants.

Case No. 22-cr-39-CJW

**REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTIONS TO
SUPPRESS**

_____

## TABLE OF CONTENTS

                                                   **Page**

*I.*     *INTRODUCTION*.................................................................3

*II.*    *FINDINGS OF FACT*.......................................................5

     *A.*     *February 22, 2021 Affidavit* ......................................5

     *B.*     *March 25, 2021 Affidavit* .........................................5

     *C.*     *May 21, 2021 Affidavit* ...........................................6

     *D.*     *November 29, 2021 Affidavit* ..................................15

     *E.*     *December 21, 2021 Affidavit* ..................................23

     *F.*     *January 13, 2022 Affidavit* .....................................24

     *G.*     *February 11, 2022 Affidavit* ...................................31

*III.*   *DISCUSSION*..............................................................40

     *A.*     *The Parties' Arguments* .........................................40

1

1.     *Belton's Arguments* ........................................................**40**

2.     *The Government's Response to Belton* ...............................**41**

3.     *D. Mims's Arguments* ....................................................**42**

4.     *The Government's Response to D. Mims* ...........................**42**

5.     *Whitney's Arguments* ....................................................**43**

6.     *The Government's Response to Whitney* ...........................**44**

7.     *E. Mims's Arguments* ....................................................**44**

8.     *The Government's Response to E. Mims* ...........................**44**

B.    *Relevant Law* .......................................................................**45**

1.     *The Statute* .................................................................**45**

2.     *Probable Cause* ............................................................**45**

3.     *Necessity* ...................................................................**47**

C.    *Analysis*...............................................................................**49**

1.     *Probable Cause* ............................................................**49**

        a.     *Belton* ..............................................................**49**

        b.     *D. Mims* ..........................................................**56**

        c.     *Whitney* ..........................................................**58**

2.     *Necessity* ...................................................................**61**

3.     *Good Faith Exception* ...................................................**65**

4.     *Fruits of the Wiretaps* ..................................................**67**

*IV.    CONCLUSION* ...............................................................................**68**

## I.    INTRODUCTION

On December 14, 2022, pursuant to a Superseding Indictment, the Grand Jury charged all Defendants in *United States v. Belton, et al.*; case no. 22-cr-39, with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), and 846, including David Poitier Belton ("Belton"), Derek Michael Mims ("D. Mims"), Anton Tarrice Whitney, Jr. ("Whitney"), and Elmer Mims ("E. Mims").  (Doc. 317.)  Defendant Whitney was additionally charged with one count of Possession of a Firearm by a Drug User in violation of 18 U.S.C. Sections 922(g)(3) and 924(a)(2).  (*Id.*)  Defendant Belton was additionally charged with one count of Possession of a Firearm by a Felon and Drug User in violation of 18 U.S.C. Sections 922(g)(1) & (3) and 924(a)(2).  (*Id.*)

The matters before the Court are Belton's Moton to Suppress (Doc. 256)[1]; D. Mims's Motion to Suppress (Doc. 259); Whitney's Motion to Suppress (Doc. 241); and E. Mims's Motion to Suppress (Doc. 245.)  The Government timely filed a combined response to each Defendant's suppression motion.  (Doc. 269.)  Whitney timely filed a reply.  (Doc. 280.)  The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.

These motions arise from Title III wiretap interception orders ("wiretaps" or "orders") that were issued between February 2021 and February 2022.  The issue presented is whether the affidavits relied on for issuance of the wiretaps established probable cause and established necessity.

---

[1] Belton's motion to suppress the search of a vehicle is addressed by my Report and Recommendation at Doc. 342.

The Government has filed the following exhibits regarding the wiretaps matter:

1. Affidavit in support of an application for a wiretap order[2] dated May 21, 2021;

2. Affidavit in support of an application for a wiretap order dated November 29, 2021;

3. Affidavit in support of an application for a wiretap order dated December 21, 2021;

4. Affidavit in support of an application for a wiretap order dated January 13, 2022;

5. Affidavit in support of an application for a wiretap order dated February 11, 2022;

6. Affidavit in support of an application for a wiretap order dated February 22, 2021; and

7. Affidavit in support of an application for a wiretap order dated March 25, 2021.

Defendants each included an Inventory of Items to be suppressed. (Doc. 256 at 2 (Belton); Doc. 259 at 2-3 (D. Mims); Doc. 241 at 2 (Whitney); Doc. 245-1 (E. Mims).)

For the following reasons, I respectfully recommend that the District Court **deny** Defendants' Motions to Suppress.

---

[2] The orders authorizing the interception of wire communications have not been made part of the record in the above-captioned case. The orders are available on the Court's docket in the files identified below, e.g., 21-wt-1-CJW. The contents of the orders themselves are not at issue. None of the Defendants claim, for example, that any order is technically or legally defective. Rather, the arguments relate solely to the probable cause and necessity of issuing the orders as determined by examination of the affidavits supporting their issuance. Thus, the absence of the orders themselves is not detrimental to the determination of the issues before the Court.

4

## II. FINDINGS OF FACT

### A. February 22, 2021 Affidavit

On February 22, 2021, Judge Williams authorized the interception of communications over Target Telephone 1 ("TT1"), used by Brian Dennis. (Doc. 2 in 21-wt-1-CJW.) DEA Task Force Officer Bryan J. Furman[3] provided an affidavit in support of the application for the wiretap explaining that there was probable cause to believe that Dennis was using TT1 in connection with a conspiracy to distribute controlled substances in violation of 21 U.S.C. Sections 841(a)(1), 843(b), and 846 (the "Target Offenses"). (Doc. 1 in 21-wt-1-CJW at 25-47.) Officer Furman also detailed the investigative techniques that had been employed and explained the reasons other techniques had not been used during the investigation. (*Id.* at 49-68.) In an Interim Report related to TT1, filed on March 10, 2021, investigating agents reported that they had intercepted potentially criminal conversations related to drug trafficking on TT1 between Dennis, and, among others, D. Mims. (Doc. 4 in 21-wt-1-CJW at 3.)

### B. March 25, 2021 Affidavit

On March 25, 2021, Judge Williams authorized the continued interception of communications over TT1, used by Dennis, the interception of communications over Target Telephone 2 ("TT2"), used by Josh Gorrell, and the interception of

---

[3] Officer Furman has been employed as a police officer with the Cedar Rapids Police Department since 1994. He has been a Narcotics Investigator since 2009 and has participated in over 100 investigations relating to the possession and distribution of controlled substances since that time. Also since 2009, he has been assigned to the DEA Task Force in Cedar Rapids, Iowa. His training and experience includes: DEA Basic Narcotics Investigation School, Informant Handling, Investigating Mid-Level Narcotics Organizations, Basic Telecommunications Exploitation Program Training, Investigating Mexican Drug Trade Organizations, and various other classes related to drug trafficking. Officer Furman also has participated in or has been the affiant on more than fifty federal wiretap affidavits related to investigations of organizations and individuals trafficking cocaine, marijuana, heroin, methamphetamine, "ecstasy," and other illicit drugs.

5

communications over Target Telephone 4 ("TT4"), used by D. Mims. (Doc. 7 in 21-wt-1-CJW.) Officer Furman provided an affidavit in support of the application for the wiretaps explaining that there was probable cause to believe that Dennis, Gorrell, and D. Mims were using TT1, TT2, and TT4 in connection with conspiracy to distribute controlled substances in violation of the Target Offenses. (Doc. 6-3 in 21-wt-1-CJW at 19-43.)

In the affidavit, Officer Furman explained that during the interception of TT1, which began on February 22, 2021, investigators intercepted four drug-related calls between Dennis and D. Mims regarding the acquisition of narcotics for the purpose of selling the drugs in Cedar Rapids, Iowa. (*Id.* at 10, 19.) Further, the affidavit provided that on March 2, 2021, investigators intercepted an incoming call from TT4, in which Dennis and D. Mims discussed traveling to their source's location to purchase narcotics. (*Id.* at 28-31.) Similarly, on March 3, 2021 and March 4, 2021, investigators intercepted incoming and outgoing calls between TT1 and TT4, where Dennis and D. Mims continued to discuss and coordinate travel to their source's location to purchase drugs. (*Id.* at 31-35.) Officer Furman also detailed the investigative techniques that had been employed in the investigation and explained the reasons for not using other techniques during the investigation. (*Id.* at 47-75.)

On April 7, 2021, due to a lack of activity occurring on TT4, investigators requested that the interception software be uninstalled from TT4 and interceptions ceased. (Doc. 12 in 21-wt-1-CJW at 4, 15-17.)

**C.    *May 21, 2021 Affidavit***

On May 21, 2021, Judge Williams authorized the interception of communications over Target Telephone 7 ("TT7"), used by Belton. (Doc. 2 in 21-wt-5-CJW.) Officer Furman provided an affidavit in support of the application for the wiretap explaining that there was probable cause to believe that Belton was using TT7 in connection with

conspiracy to distribute controlled substances in violation of the Target Offenses.  (Doc. 278 at 4-5.)

The pertinent target subjects identified in the affidavit were Belton, D. Mims, and Whitney.  (*Id.* at 10-11, 19.)  In the affidavit, based on a post-*Miranda* interview with Nicholas Griffin, where he identified Belton as the drug source for narcotics brought from California to Cedar Rapids for distribution, and analysis of common callers between two telephone numbers used by Belton, Officer Furman stated that, based on his training and experience, he believed that Belton was the source of supply for the Dennis Drug Trafficking Organization ("DTO") in Cedar Rapids.  (*Id.* at 10-11.)  Based on intercepted conversations on TT1 between Dennis and D. Mims discussing acquisition of narcotics for purposes of distributing the narcotics in Cedar Rapids, Officer Furman stated that, based on his training and experience, he believed that D. Mims was a member of the Dennis DTO acting as a distributor of drugs.  (*Id.* at 10.)  Based on intercepted conversations on TT6 between Whitney and Phillip Rogers, a telephone used by Rogers, who is believed to be a distributor of methamphetamine supplied by Belton, regarding collection of money, Officer Furman stated that, based on his training and experience, he believed that Whitney was a member of the Dennis DTO tasked with collecting money for Belton.  (*Id.* at 16, 19.)

In support of probable cause to issue the wiretap on TT7, used by Belton, Officer Furman's affidavit set forth the following facts:

On January 7, 2021, Nicholas Griffin was arrested in possession of ten pounds of methamphetamine.  (*Id.* at 31.)  Following Griffin's arrest, investigators conducted a post-*Miranda* interview.  (*Id.*)  During the interview, Griffin identified Belton as the source of the seized methamphetamine.[4]  (*Id.*)  Griffin also told investigators that Belton

---

[4] Griffin knew Belton as "David" and "Blood."

was a distributor of narcotics in Cedar Rapids, with the source of his supply in California. (*Id.*) Griffin identified a picture of Belton as the individual he knew as his supplier of methamphetamine. (*Id.* at 31-32.)

Investigators conducted a toll analysis of Belton's telephone between December 4, 2020 and January 5, 2021, the month prior to Griffin's arrest. (*Id.* at 32.) The analysis revealed 54 contacts between Griffin and Belton using their known telephone numbers. (*Id.*) Griffin told investigators that he had purchased weights of 3, 4, 3, and 5 pounds of methamphetamine from Belton in 2020. (*Id.*) On March 3, 2021, in a federal proffer interview, Griffin confirmed the information he provided to investigators in his post-*Miranda* interview. (*Id.* at 32-33.)

On March 2, 2021, at approximately 9:13 a.m., investigators intercepted a conversation on TT1 between Dennis and Tartorius Allen, believed to be a member of the Dennis DTO, discussing Belton's position within the organization. (*Id.* at 33.) During the intercepted conversation, Dennis stated "Leroy . . . gonna do whatever Blood say because Blood got the connect, you know what I'm saying? Blood got the he got the he got the yay and nay so he gonna do whatever he say." (*Id.*) Later in the intercepted conversation, Dennis stated "That's why you don't want me to eat cause you know I'm gonna get in and take off." (*Id.* at 34.) Officer Furman interpreted the conversation as Dennis being upset with Belton for not providing him drugs for Dennis to distribute. (*Id.*) Officer Furman interpreted Dennis saying Belton doesn't "want him to eat" to mean that Belton was keeping drugs from Dennis and depriving Dennis of income from the sale of drugs. (*Id.*) Finally, Officer Furman interpreted Dennis's statement "do whatever Blood say because Blood got the connect" to mean that Belton had the connection with the source of supply in California and Belton controlled who was supplied with narcotics. (*Id.*)

8

Also on March 2, 2021, at approximately 10:22 a.m., investigators intercepted a call from D. Mims to Dennis on TT1. (*Id.*) During the conversation, D. Mims asked Dennis "you headin' out with us?" (*Id.* at 35.) Later, D. Mims stated, "he said you, you was comin'." (*Id.*) Dennis responded that he thought "Blood was sending me off." (*Id.*) Later in the conversation, Dennis stated, "My money ready, my money all packaged up, I'm ready bro, whenever you all say come on." (*Id.*) Officer Furman interpreted this conversation as D. Mims asking Dennis whether he was travelling to the source location with other DTO members to acquire drugs. (*Id.* at 36.) Officer Furman believed that D. Mims comment that "he said you, you was comin'" meant that Belton told D. Mims that Dennis was making the trip with them. (*Id.*)

On March 3, 2021, at approximately 12:39 p.m., investigators intercepted a call from D. Mims to Dennis on TT1. (*Id.*) During the conversation, D. Mims stated, "Everything looking like we still on for tomorrow." (*Id.*) Dennis asked "you all driving out right?" and then stated that he was going to fly out there. (*Id.*) Officer Furman interpreted this conversation to be D. Mims and Dennis coordinating the trip to the source location to purchase drugs. (*Id.* at 37.)

On March 29, 2021, Marion Police investigator Jeff Gilson interviewed Robert Bates. (*Id.* at 37-38.) During the interview, Bates told investigators that he purchased methamphetamine from "Blood." (*Id.* at 38.) Bates told investigators that, for approximately eight months before he was placed on probation, he had been purchasing pound quantities of methamphetamine from "Blood" for $3,000 per pound once or twice per week. (*Id.*) Bates also told investigators that "Blood" was from California and was not always in Cedar Rapids, but he only purchased the methamphetamine while "Blood" was in Cedar Rapids. (*Id.*) A toll analysis of TT7, the phone used by Belton, showed a contact between Bates and TT7 on May 1, 2021. (*Id.*)

9

On April 16, 2021, investigators intercepted a conversation between Rogers and Whitney over TT6, the phone used by Rogers. (*Id.* at 41-42.) During the conversation, Whitney asked Rogers, "you, uh, got a ten pack for me?" (*Id.* at 41.) Whitney also said, "Bro told me to hit you for the ten pack." (*Id.*) Officer Furman interpreted these two statements to mean that Whitney was tasked by Belton to collect a $10,000 debt from Rogers. (*Id.* at 41-42.) On April 17, 2021, investigators intercepted another conversation between Rogers and Whitney over TT6. (*Id.* at 42-43.) During the conversation, Whitney told Rogers, "trying to see what's up with bro was talking about last night. . . He said you should have ten for him." (*Id.* at 42.) Rogers responded that he had "eight for him. Because he took two. . . . He took two down already, so I got, I got eight for him." (*Id.*) Rogers then explained that he had 4.5 "for him right now though." (*Id.*) Rogers further stated, "I said I got 4.5 for him right now, I got to get some more cash." (*Id.* at 43.) Officer Furman interpreted this conversation to mean that Whitney called Rogers again to collect money for Belton and Rogers told Whitney that Belton had already collected $2,000 from him and, that, at the time of the call, he had $4,500 to pay toward his debut to Belton. (*Id.*)

On May 1, 2021, investigators intercepted a conversation between Rogers and Belton over TT6, with the incoming call from TT7. (*Id.* at 45.) During the conversation, Belton asked Rogers "when you going over there so I can be ready?" (*Id.*) Rogers responded, "I'm fittin' to go pick it up right now bro." (*Id.*) Rogers also told Belton that he would let him "know as soon as I grab it." (*Id.*) Officer Furman interpreted the conversation to mean that Belton had contacted Rogers to collect money from an outstanding debt and Rogers would let Belton know when he had picked up the money. (*Id.*) On the same date, in a second intercepted call over TT6 between Rogers and Belton, Rogers informed Belton that he was "on my way over there right now." (*Id.* at 46.)

10

Officer Furman interpreted the call to mean the Rogers was on his way to collect the money and meet Belton to pay his debt. (*Id.*)

A toll analysis of TT7 showed 20 contacts with Whitney on TT7 and 6 contacts with Rogers on TT7 between April 11, 2021 and May 11, 2021. (*Id.* at 49.)

The affidavit also details the efforts taken by investigators to achieve the goals of the investigation. (*Id.* at 50-94.) Officer Furman explained that intercepted communications over TT1 and TT6, involving Dennis, D. Mims, Rogers, and Whitney, helped investigators learn about Belton's role in the DTO; however, based on his training and experience, Furman believed that a wiretap of TT7, the phone used by Belton, would allow investigators better insight into Belton's role in the DTO and the methamphetamine trafficking operation. (*Id.* at 50-51.) Specifically, Furman stated that he believed interception of wire communications over TT7 would further the investigation by: (1) discovering the full scope and identification of key personnel in the Dennis DTO; (2) discovering the identities and roles of drug suppliers; (3) discovering stash locations for the drugs; (4) discovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and (5) discovering evidence of the Target Offenses. (*Id.* at 51-53.) Officer Furman stated that interception of wire communications over TT7 was necessary because: (1) normal investigative techniques have been tried and have failed to fully achieve the goals of the investigation; (2) normal investigative techniques were reasonably unlikely to succeed if tried; and (3) certain investigative techniques were too dangerous to be tried. (*Id.* at 53.)

Officer Furman addressed the following investigative techniques:

Prior wiretaps involving telephones used by various members of the Dennis DTO have provided useful information regarding the drug-trafficking organization under investigation. (*Id.* at 54-56.)

Investigators had used confidential sources ("CS") in the investigation. CS1 was used in a controlled purchase of heroin from Dennis. (*Id.* at 56.) Officer Furman stated that CS1's knowledge and usefulness to the investigation was limited to the bottom tier of the organization. (*Id.*) CS2 purchased drugs from an individual under investigation but had no knowledge or direct contact with members of the Dennis DTO. (*Id.* at 57.) CS3, who had purchased methamphetamine from Rogers, was limited to providing information about Rogers but no other DTO members, making his cooperation alone insufficient to achieve the goals of the investigation. (*Id.*) Similarly, CS4, who had purchased drugs from an individual under investigation, was limited to providing information about that individual but no other DTO members, making his cooperation alone insufficient to achieve the goals of the investigation. (*Id.* at 57-58.) Based on the foregoing, Officer Furman stated that "confidential sources normally have limited information, either furnished by a subject or learned secondhand from others. I believe this information would not, without evidence sought by this application, result in a successful prosecution of all members of the DENNIS DTO." (*Id.* at 58.)

Investigators conducted four controlled purchases using CS1 to purchase heroin from Dennis, including two instances where Dennis used a third party to conduct the meeting with CS1. (*Id.* at 59.) Officer Furman noted that the use of "runners" (third parties) made controlled purchases of limited value and ineffective for meeting the goals of the overall investigation. (*Id.*) Officer Furman also noted that Dennis employed counter-surveillance and public meeting areas for drug purchases, making controlled purchases less informative regarding the inner workings of the organization. (*Id.* at 60.) Officer Furman discussed the controlled purchases involving Rogers and CS3, noting that the controlled purchases allowed investigators to identify Rogers and his likely stash location, but did not provide information as to Rogers's connection to Belton and other members of the Dennis DTO. (*Id.* at 60-61.)

12

With regard to physical surveillance, Officer Furman stated that "even if highly successful, [surveillance] has proven unlikely to significantly advance the investigation." (*Id*. at 62.) Officer Furman opined that physical surveillance, when combined with court-ordered wiretaps, was more likely to produce admissible evidence of criminal activity. (*Id*.) Further, Officer Furman explained that investigators performed surveillance on Dennis and other DTO members but such surveillance did little to reveal the organization's source of supply. (*Id*. at 62-64.) Additionally, cell site location technology and telephone precision technology was used to little effect, as it only gave general location information and lacked specific information of criminal activity. (*Id*. at 64.) Officer Furman indicated that he considered using tracking devices on vehicles used by Belton, Dennis, and other members of the DTO, but determined that such devices would be of little use as the members of the organization used random vehicles and investigators had not determined specific vehicles that would produce useful information. (*Id*. at 64-65.) Officer Furman also noted that physical surveillance in conjunction with intercepted conversations on TT1 allowed investigators to observe locations which would not have been possible without the wiretap of TT1. (*Id*. at 65-68, 70-71.) Officer Furman indicated that investigators would continue to use physical surveillance in conjunction with intercepted communications for purposes of identifying additional associates of Belton, surveilling drug transactions, identifying source locations, and ultimately seizing drugs and assets. (*Id*. at 73.)

Officer Furman stated that investigators had not had the opportunity to introduce undercover law enforcement agents into the Dennis DTO and Officer Furman did not believe that undercover agents would be feasible in the investigation. (*Id*.) Officer Furman explained that it would be difficult for an undercover agent to gain the trust of any DTO member necessary to advance the investigation. (*Id*. at 74.) Officer Furman also stated that it would be dangerous for an undercover agent to attempt to infiltrate the

13

Dennis DTO due to Dennis's violent history and Belton's connection to violent gangs in California.  (*Id.* at 74-75.)

Officer Furman indicated that search warrants had been used to good effect in identifying members of the Dennis DTO.  (*Id.* at 75-76.)  However, Officer Furman opined that further search warrants at that time would be premature and tip-off Belton and others to the investigation.  (*Id.* at 77.)  Officer Furman stated that search warrants in and of themselves would not meet the objectives of the investigation because evidence seized would be linked to specific individuals rather than the organization at large.  (*Id.* at 77-78.)

Officer Furman explained that, while multiple interviews had been conducted during the investigation, the interviews had limited effectiveness in gathering information on the membership and operation of the Dennis DTO.  (*Id.* at 78-79.)  Officer Furman stated that he also considered the use of grand jury subpoenas for financial records of members of the Dennis DTO, but investigators had not identified the financial institutions used by the Dennis DTO.  (*Id.* at 80.)  Further, Officer Furman was skeptical that issuing grand jury subpoenas to individuals would be successful because subjects of the investigation would likely invoke their Fifth Amendment rights and would be unlikely to provide truthful testimony.  (*Id.* at 81-82.)

Officer Furman indicated that, during the investigation, trash searches had proven to be generally unfruitful or too difficult to effect due to location of the trash or movement of the trash to other parts of Cedar Rapids.  (*Id.* at 82-85.)  Officer Furman also indicated that the investigation had not yet revealed all the locations which may yield admissible evidence, but investigators would continue to utilize trash searches in the future.  (*Id.*)

Officer Furman also outlined various other surveillance techniques used in the investigation such as pole cameras, vehicle trackers, and precision locators for TT1 and TT4.  (*Id.* at 85-88.)  Like physical surveillance techniques, these other techniques

14

revealed only general information and locations, not specific information regarding the DTO members or criminal activity. (*Id.*)

Officer Furman indicated that the use of pen registers, trace devices, and toll analysis are all helpful and had been used in the investigation, but by themselves would not achieve the goals of the investigation. (*Id.* at 88-90.) Officer Furman explained that the information gained from a wiretap would be more specific and confirm the general information gleaned from pen registers, trace devices, and toll analysis. (*Id.*)

Officer Furman stated that a mail cover request for Dennis had provided some general information but stated that it would not provide additional evidence about the organization's drug-trafficking activities beyond what had already been learned. (*Id.* at 90-91.)

Officer Furman noted that investigators had performed financial investigation into Dennis and Belton but had failed to learn much information. (*Id.* at 93-94.) Officer Furman indicated that such investigation would continue but opined that it would not fully reveal the extent of the criminal organization. (*Id.* at 93.)

Officer Furman concluded that electronic surveillance was likely the only means of investigation to fully expose the overall scope and extent of the criminal organization under investigation. (*Id.* at 94.) Officer Furman stated that the methods of investigation discussed in the affidavit have had limited success and appeared unlikely to succeed if tried or continued, or were too dangerous to employ, making the wiretaps the best method to achieve the goals of the investigation. (*Id.*)

### D.     *November 29, 2021 Affidavit*

On November 29, 2021, Judge Williams authorized the interception of communications over TT7, used by David Belton. (Doc. 2 in 21-wt-7-CJW.) Officer Furman provided an affidavit in support of the application for the wiretap explaining that there was probable cause to believe that Belton was using TT7 in connection with

15

conspiracy to distribute controlled substances in violation of the Targeted Offenses. (Doc. 278-1 at 2-3.)

The pertinent target subjects identified in the affidavit were Belton, D. Mims, and Whitney. (*Id.* at 8-9, 10.) In the affidavit, Officer Furman stated that, based on his training and experience, he believed Belton was the leader of a methamphetamine distribution organization ("Belton DTO") in Cedar Rapids. (*Id.* at 14.) Further, Officer Furman stated that he believed that Belton supplied methamphetamine to distributors, Dennis, D. Mims, Whitney, and Rogers. (*Id.*) Officer Furman indicated that based on the investigation, law enforcement believed that the methamphetamine was sourced from FNU LNU a/k/a "Papa" in California to Belton for distribution in Cedar Rapids. (*Id.*) Officer Furman indicated that Belton used TT7 to discuss and coordinate meetings with DTO members. (*Id.*) In the affidavit, Officer Furman sought permission to renew the interception of wire communications over TT7 to uncover the scope of the Belton DTO, identify DTO members, identify stash houses, and expand the investigation to other districts where the source of supply was believed to be located. (*Id.* at 14-15.)

In support of probable cause to issue the wiretap on TT7, Officer Furman's affidavit set forth the following facts:

In February 2021, investigators utilized a court-authorized Title III wiretap of TT1 and TT9, both used by Dennis, and learned that Dennis was using Belton as his source for methamphetamine. (*Id.* at 15.) Discussions between Dennis and D. Mims intercepted over TT1, also provided investigators with information regarding Belton being the source of supply of methamphetamine. (*Id.*)

Officer Furman again detailed the information learned from Griffin's arrest and post-*Mirada* interview on January 7, 2021, discussing Belton as the source of supply for

methamphetamine in Cedar Rapids.[5] (*Id.* at 17-19.)  Officer Furman also detailed the interview with Bates on March 29, 2021, where Bates told investigators that he purchased pound quantities of methamphetamine from Belton.[6] (*Id.* at 19-20.)  Additionally, Officer Furman detailed the May 1, 2021 call intercepted over TT7 regarding Rogers's payment of a drug debt to Belton.[7] (*Id.* at 22-24.)

On May 21, 2021, at approximately 1:25 p.m., investigators intercepted a call between Belton and D. Mims over TT7.  (*Id.* at 24-26.)  During the conversation, Belton told D. Mims that he had to send his "momma 800 bucks" and also had to send an unidentified individual "300 bucks too."  (*Id.* at 25.)  D. Mims responded "Alright, yeah so that be easy, what . . . 10, 6."  (*Id.*)  Belton then asked D. Mims "Yeah, so what uh, where everything at?"  (*Id.*)  D. Mims indicated that everything was at his house, and they could meet later that afternoon.  (*Id.*)  Officer Furman interpreted the conversation to mean that Belton owed two people $1,100 and after paying those two people they would still have $10,600 remaining.  (*Id.*)  Officer Furman also believed that Belton wanted to know where the drugs and money were located and wanted to meet with D. Mims to discuss DTO business.  (*Id.* at 26.)

On the same date, at approximately 4:59 p.m., investigators intercepted an incoming call on TT7 from Whitney to Belton.  (*Id.*)  During the conversation, Whitney asked, "Yo where everything at?" and Belton responded that Whitney needed to ask D. Mims.  (*Id.*)  Officer Furman interpreted this conversation to mean that Whitney was

---

[5] The full discussion of Griffin's arrest and post-*Miranda* interview is provided in the Court's discussion of the May 21, 2021 Affidavit above.
[6] The full discussion of the Bates interview is provided in the Court's discussion of the May 21, 2021 Affidavit above.
[7] The full discussion of the May 1, 2021 intercepted call over TT7 is provided in the Court's discussion of the May 21, 2021 Affidavit above.

inquiring where the drugs were located, and Belton told him to talk to D. Mims to find out where the product was located. (*Id.*)

On May 24, 2021, investigators intercepted a call to TT7 between Belton and D. Mims. (*Id.* at 28-31.) During the conversation, Belton and D. Mims discussed an unidentified individual who owed Belton money. (*Id.*) The discussion centered on the unidentified individual spending money on gambling and women instead of paying the debt. (*Id.*)

On the same date, investigators intercepted a call to TT7 from Whitney to Belton. (*Id.* at 31-33.) During the conversation, Whitney asked Belton, "Shit man, you told me four, why is bro telling me five?" (*Id.* at 32.) Belton responded, "That what he figured, that's his price fool." (*Id.*) Whitney reiterated that Belton had told him "four." (*Id.*) Belton responded, "Man, whatever he worked out, that's what he got money he gotta make up. He's got money that needs to be made up so shit whatever he decide is what he decide." (*Id.*) Whitney complained that he had to "go get another thousand dollars for him, but I already gave him the four for the price you told me." (*Id.*) Officer Furman interpreted this conversation to mean Whitney was upset with Belton for giving him a price of $4,000 for drugs, but the direct supplier was charging Whitney $5,000. (*Id.* at 33.) Further, Officer Furman stated that Belton explained to Whitney that he was not a direct supplier and whatever the direct supplier was charging was the price that Whitney was going to have to pay. (*Id.*)

On June 14, 2021, investigators intercepted an incoming call from FNU LNU a/k/a "Papa" to Belton over TT7. (*Id.* at 33-35.) During the call, Belton and Papa discussed the amount of methamphetamine Belton had (ten pounds) and when Belton would be returning to California to obtain more drugs. (*Id.*)

Like in the Mary 21, 2021 affidavit, Officer Furman believed that a wiretap of TT7, the phone used by Belton, would allow investigators better insight into Belton's role

18

in the DTO and the methamphetamine trafficking operation.  (*Id.* at 38-40.)  Specifically, Officer Furman stated that, based on his training and experience, he believed interception of wire communications over TT7 would further the investigation by: (1) discovering the full scope and identification of key personnel in the DTO; (2) discovering the identities and roles of drug suppliers; (3) discovering stash locations for the drugs; (4) discovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and (5) discovering evidence of the Target Offenses.  (*Id.* at 40-41.)  Officer Furman stated that interception of wire communications over TT7 was necessary because: (1) normal investigative techniques have been tried and have failed to fully achieve the goals of the investigation; (2) normal investigative techniques were reasonably unlikely to succeed if tried; and (3) certain investigative techniques were too dangerous to be tried.  (*Id.* at 41.)

Officer Furman addressed the following investigative techniques:

Prior wiretaps involving telephones used by various members of the Dennis DTO, including Belton's phone, TT7, provided useful information regarding the drug trafficking organization under investigation.  (*Id.* at 41-3.)  Officer Furman noted that, now that Dennis and his heroin co-conspirators had been arrested, additional interception of TT7 would be useful for investigation in the methamphetamine trafficking headed by Belton.  (*Id.* at 43-44.)

Investigators had used a confidential source ("CS") in the investigation. Specifically, a CS was used to purchase methamphetamine from Rogers, but he was limited to providing only information about Rogers and no other DTO members, making his cooperation alone insufficient to achieve the goals of the investigation.  (*Id.* at 44.) Officer Furman opined that, given Belton's use of multiple layers of lower-level DTO members, it would be unlikely that law enforcement could develop a CS capable of infiltrating the DTO at Belton's level.  (*Id.*)

Officer Furman discussed the controlled purchases involving Rogers and the CS, noting that the controlled purchases allowed investigators to identify Rogers and his likely stash location, but did not provide information as to Rogers's connection to Belton and other members of the DTO. (*Id.* at 45-46.)

Officer Furman indicated that investigators had performed physical surveillance of known DTO members, but surveillance alone had done little to expose the DTO or locations used by the DTO. (*Id.* at 46, 48-50.) Additionally, cell site location technology and telephone precision technology were used to little effect, as they only gave general location information and lacked specific information of criminal activity. (*Id.* at 64.) Officer Furman indicated that he considered using tracking devices on vehicles used by Belton and other members of the DTO but determined it would be of little use as Belton lived primarily in California and tended to show up in Cedar Rapids unannounced. (*Id.* at 47.) Law enforcement was also unaware of the vehicles Belton used when in Cedar Rapids. (*Id.*) Officer Furman noted that physical surveillance in conjunction with intercepted conversations on TT7 would help meet the objectives of the investigation, allowing investigators to learn of and observe meetings from concealed locations. (*Id.* at 50-51.)

Officer Furman stated that investigators had not had the opportunity to introduce undercover law enforcement agents into the Belton DTO and Officer Furman did not believe that undercover agents would be feasible in the investigation. (*Id.* at 51-52.) Officer Furman explained that it would be difficult for an undercover agent to gain the trust of any DTO member, particularly Belton, necessary to advance the investigation. (*Id.*) Officer Furman also stated that it would be dangerous for an undercover agent to attempt to infiltrate the Belton DTO due to Belton's connection to violent gangs in California. (*Id.*)

Officer Furman indicated that search warrants had been used to good effect in the investigation of Dennis and heroin trafficking in Cedar Rapids. (*Id.* at 52-54.) Officer Furman indicated that he considered a search warrant for Rogers's stash location but determined that such a search warrant would be premature and tip Belton and others off to the investigation. (*Id.* at 53.) Further, Officer Furman opined that without specific knowledge, search warrants create only a random chance of discovering admissible evidence. (*Id.* at 55.) Additionally, Officer Furman stated that search warrants in and of themselves would not meet the objectives of the investigation because evidence seized would be linked to specific individuals rather than the organization at large. (*Id.* at 55-56.) Officer Furman opined that search warrants used in conjunction with intercepted communications is a more effective use of search warrants. (*Id.*)

Officer Furman explained that, while multiple interviews had been conducted during the investigation, the interviews had limited effectiveness in gathering information on the membership and operation of the Belton DTO. (*Id.* at 56-57.) Officer Furman noted that, after his arrest, in November 2021, Dennis gave a proffer interview where he identified Belton as selling pounds of methamphetamine in Cedar Rapids. (*Id.* at 58.) Officer Furman stated that he also considered the use of grand jury subpoenas for financial records of members of the Belton DTO, but investigators had not identified the financial institutions used by the Belton DTO. (*Id.* at 58-59.) Further, Officer Furman was skeptical that issuing grand jury subpoenas to individuals would be successful because subjects of the investigation would likely invoke their Fifth Amendment rights and would be unlikely to provide truthful testimony. (*Id.* at 59.) Officer Furman was also concerned that using grand jury subpoenas on lower-level DTO members would tip-off Belton and other higher-level members to the investigation. (*Id.* at 59-60.)

Officer Furman indicated that, during the investigation, trash searches had proven to be unsuccessful. (*Id.* at 60.) Officer Furman also noted that Belton's primary

21

residence was in California and wire interceptions of Belton's phone indicated that he did not handle the drugs, making trash searches of Belton's Iowa residence unlikely to yield evidence. (*Id.* at 60-61.) Officer Furman also indicated that the investigation had not yet revealed all the locations which may yield admissible evidence and investigators would continue to utilize trash searches when practicable. (*Id.* at 61.)

Officer Furman also outlined various other surveillance techniques used in the investigation such as pole cameras, vehicle trackers, and precision locators for TT7 and TT4. (*Id.* at 62-63.) Like physical surveillance techniques, these other techniques revealed only general information and locations, not specific information regarding Belton, D. Mims, or other DTO members or criminal activity. (*Id.*)

Officer Furman indicated that the use of pen registers, trace devices, and toll analysis were all helpful and had been used in the investigation, but by themselves would not achieve the goals of the investigation. (*Id.* at 64-65.) Officer Furman explained that the information gained from a wiretap would be more specific and confirm the general information gleaned from pen registers, trace devices, and toll analysis. (*Id.*)

Officer Furman indicated that mail cover requests had been utilized for D. Mims and Rogers but had not yet yielded any information pertinent to the investigation. (*Id.* at 66.)

Officer Furman noted that investigators believed that portions of proceeds from drug sales were transported via passenger vehicles to the source of supply in California. (*Id.* at 67.) Investigators also learned that Belton used wire transfers to move money to DTO members in other states. (*Id.* at 68.) Officer Furman noted that Belton had on numerous occasions engaged in a high number of wire transfers to multiple recipients. (*Id.*) Officer Furman indicated that financial investigation would continue to be used but opined that it would not fully reveal the extent of the criminal organization. (*Id.*)

Officer Furman concluded that electronic surveillance was likely the only means of investigation to fully expose the overall scope and extent of the criminal organization under investigation. (*Id.*) Officer Furman stated that the methods of investigation discussed in the affidavit had yielded limited success and appeared unlikely to succeed if tried or continued, or were too dangerous to employ, making the wiretaps the best method to achieve the goals of the investigation. (*Id.* at 69.)

## E.    *December 21, 2021 Affidavit*

On December 21, 2021, Judge Williams authorized the interception of communications over TT10, used by D. Mims. (Doc. 2 in 21-wt-8-CJW.) Officer Furman provided an affidavit in support of the application for the wiretaps explaining that there was probable cause to believe that D. Mims was using TT10 in connection with conspiracy to distribute controlled substances in violation of the Target Offenses. (Doc. 278-2 at 3-4.) The pertinent target subject was D. Mims, who, based on intercepted communications between D. Mims and Belton over TT7, Officer Furman, based on his training and experience, believed was a member of the Belton DTO, acting as a shipment coordinator and leader of several retail distributors in the Cedar Rapids area. (*Id.* at 9-10.)

In support of probable cause to issue the wiretap on TT10, used by D. Mims, Officer Furman's affidavit detailed intercepted calls during the time period of November 29, 2021 to December 2, 2021 between Belton and D. Mims regarding coordination of the delivery of drugs from California to Cedar Rapids. (*Id.* at 19-29.) Officer Furman stated that the interception of TT10 would further the investigation into the Belton DTO, including D. Mims's position in the organization, methamphetamine trafficking in Cedar Rapids, and the identity of lower-level distributors in the organization. (*Id.* at 30-33.) Further, Officer Furman detailed the investigative techniques that had been employed in

the investigation and explained the reasons for not using other techniques during the investigation. (*Id.* at 34-63.)

## F.    *January 13, 2022 Affidavit*

On January 13, 2022, Judge Williams authorized the interception of communications over TT10, used by D. Mims, TT 13, used by Belton, and TT14, used by Whitney. (Doc. 9 in 21-wt-8-CJW.) Officer Furman provided an affidavit in support of the application for the wiretap explaining that there was probable cause to believe that Belton was using TT13, D. Mims was using TT10, and Whitney was using TT14 in connection with conspiracy to distribute controlled substances in violation of the Targeted Offenses. (Doc. 278-3 at 5-6.)

The pertinent target subjects identified in the affidavit were Belton, D. Mims, and Whitney. (*Id.* at 9-12.) In the affidavit, Officer Furman stated that, based on his training and experience, he believed Belton was the source of supply who coordinated the delivery of drugs from "Papa" in California to Cedar Rapids for distribution. (*Id.* at 9-10.) Officer Furman stated that, based on his training and experience, he believed D. Mims was a member of the Belton DTO and he acted as the shipment coordinator and a leader of several distributors in the Cedar Rapids area. (*Id.* at 10-11.) Officer Furman stated that, based on his training and experience, he believed Whitney was a member of the Belton DTO and he was tasked with collecting money from distributors on behalf of Belton and D. Mims. (*Id.* at 11-12.) Officer Furman indicated that: (1) Belton used TT13 to discuss DTO operations and coordinate meetings with DTO members; (2) D. Mims used TT10 to discuss DTO operations and coordinate meetings with DTO members; and (3) Whitney used TT14 to conduct drug trafficking activities for the DTO and to collect drug proceeds from DTO distributors. (*Id.* at 20-21.) In the affidavit, Officer Furman sought permission to continue the interception of wire communications over TT10 and to initiate interception of wire communications over TT13 and TT14 to

24

uncover the scope of the Belton DTO, identify DTO members, identify stash houses, and expand the investigation to other districts where the source of supply is believed to be located. (*Id.* at 21-22.)

In support of probable cause to issue the wiretaps over TT10, TT13, and TT14, Officer Furman's affidavit set forth the following facts:

Like in previous affidavits, Officer Furman detailed the interview with Bates on March 29, 2021, where Bates told investigators that he purchased pound quantities of methamphetamine from Belton.[8] (*Id.* at 22-23.)

On December 9, 2021, investigators intercepted a text message sent to TT7 by an unidentified male ("UM") which stated, "Shit been dry my people coming up on Friday s I should Ben done with the 3rd one on the 4 one by weekend." (*Id.* at 23.) Officer Furman interpreted this text message to mean that drug sales had been slower than usual and that the UM had sold three pounds of methamphetamine and would soon start selling the fourth pound. (*Id.*) On the same date, investigators intercepted a conversation between Belton and the UM over TT7. (*Id.* at 24.) During the conversation, Belton stated, "I spent that six thousand dollars already." (*Id.*) The UM responded, "Shit, it was sold for me. I mean I got that that what I tell you I have. Be like twenty-five or some shit." (*Id.*) The UM also stated, "I would have gave it to you for fifty five. I would have made that five hundred." (*Id.*) Belton responded, "I only need five hundred right now." (*Id.*) The UM responded, "I got you, take this what I got then that way you cover." (*Id.*) Officer Furman interpreted the conversation to me that the UM was collecting money from individuals who had been fronted methamphetamine. (*Id.* at 25.) Officer Furman opined that the UM was telling Belton that he had collected $25,000 and

---

[8] The full discussion of the Bates interview is provided in the Court's discussion of the May 21, 2021 Affidavit above.

Belton wanted him to continue to collect money, but he needed $500 of what had already been collected.  (*Id.*)

On December 22, 2021, investigators intercepted a text exchange between D. Mims and Whitney on TT10, with Whitney using TT14.  (*Id.* at 29.)  In the text exchange, Whitney stated "He gone wait to get more tomorrow still waitin on more bread but got tha rest he owes now tho."  (*Id.*)  Officer Furman interpreted this text to mean that one of the people Whitney was collecting drug proceeds from did not have all the money at that time but would have the money the next day.  (*Id.*)

On December 23, 2021, investigators intercepted a conversation over TT10 between D. Mims and Bates.  (*Id.* at 25-26.)  During the conversation, Bates stated, "I was trying to link up."  (*Id.* at 26.)  D. Mims asks, "What do you need?  One?"  (*Id.*)  Bates responded, "Uh, yeah."  (*Id.*)  Officer Furman interpreted the call to mean that Bates needed to order drugs from D. Mims and Bates ordered one pound of methamphetamine.  (*Id.*)

On December 26, 2021, investigators intercepted a call between Belton and D. Mims over TT10, with D. Mims calling TT13.  (*Id.* at 27.)  Belton and D. Mims discussed purchasing firearms.  (*Id.* at 27-29.)

On December 27, 2021, investigators intercepted a call between D. Mims and Whitney over TT10, with D. Mims calling TT14.  (*Id.* at 29-30.)  During the conversation, D. Mims told Whitney, "I've got to leave tomorrow." (*Id.* at 30.)  Whitney responded, "Alright you'll have it tonight."  (*Id.*)  Officer Furman interpreted this conversation to mean that Whitney would meet with D. Mims later to provide D. Mims with drug proceeds.  (*Id.* at 30-31.)

On January 3, 2022, investigators intercepted a call between D. Mims and Albert Bailey[9] on TT10. (*Id.* at 31-34.) In the intercepted conversation D. Mims and Bailey discussed coordinating the next trip to California to obtain drugs. (*Id.*) Also, on December 30, 2021 and on January 3, 2022, D. Mims and Timothy Webber exchanged text messages arranging the purchase of drugs and the payment for the drugs. (*Id.* at 34-35.)

Officer Furman believed that a continuance of the wiretap of TT10, used by D. Mims, and the initiation of wiretaps on TT13, used by Belton, and TT14, used by Whitney, would substantially further the investigation and provide better insight into Belton's role, D. Mims's role, and Whitney's role in the DTO and the methamphetamine trafficking operation. (*Id.* at 39-43.) Officer Furman stated that interception of wire communications over TT10, TT13, and TT14 was necessary because: (1) normal investigative techniques had been tried and failed to fully achieve the goals of the investigation; (2) normal investigative techniques were reasonably unlikely to succeed if tried; and (3) certain investigative techniques were too dangerous to be tried. (*Id.* at 43.)

Officer Furman addressed the following investigative techniques:

Prior wiretaps involving telephones used by various members of the Dennis and Belton DTO, including Belton's phone, TT7, D Mims's phone, TT10, provided useful information regarding the drug trafficking organization under investigation. (*Id.* at 43-47.) Officer Furman noted that additional interception of TT10 would be useful for investigation into other members of the organization. (*Id.* at 47.)

Investigators had used a confidential source ("CS") in the investigation. Specifically, a CS was used to purchase methamphetamine from Rogers, but he was

---

[9] On December 1, 2021, investigators intercepted a call over TT7 between Belton and Bailey, identifying Bailey as the driver of a vehicle carrying methamphetamine from California to Iowa. (Doc. 278-3 at 31.)

limited to providing only information about Rogers and no other DTO members, making his cooperation alone insufficient to achieve the goals of the investigation. (*Id.* at 48.) Officer Furman opined that, given Belton's use of multiple layers of lower-level DTO members, it would be unlikely that law enforcement could develop a CS capable of infiltrating the DTO at Belton's level. (*Id.*)

Officer Furman discussed the controlled purchases involving Rogers and the CS, noting that the controlled purchases allowed investigators to identify Rogers and his likely stash location, but did not provide information as to Rogers's connection to Belton and other members of the DTO. (*Id.* at 49-50.)

Officer Furman indicated that investigators had performed physical surveillance of known DTO members, but surveillance alone had done little to expose the DTO or locations used by the DTO. (*Id.* at 50-57.) Additionally, cell site location technology and telephone precision technology were used to little effect, as they only gave general location information and lacked specific information of criminal activity. (*Id.* at 50-51.) Officer Furman indicated that he considered using tracking devices on vehicles used by Belton and other members of the DTO but determined it would be of little use as Belton lived primarily in California and tended to show up in Cedar Rapids unannounced. (*Id.* at 51.) Law enforcement was also unaware of the vehicles Belton used when in Cedar Rapids. (*Id.*) Investigators also conducted surveillance on Belton's Iowa residence, D. Mims's residence, and Whitney's residence, but only learned limited information related to vehicles used by various DTO and non-DTO members, particularly the vehicle Bailey used to drive from California to deliver drugs in Iowa. (*Id.* at 52-55.) Officer Furman noted that physical surveillance in conjunction with intercepted conversations on TT10 would help meet the objectives of the investigation, allowing investigators to learn of and observe meetings from concealed locations and identify DTO members. (*Id.* at 55-57.)

Officer Furman stated that investigators had not had the opportunity to introduce undercover law enforcement agents into the Belton DTO and Officer Furman did not believe that undercover agents would be feasible in the investigation. (*Id*. at 57-58.) Officer Furman explained that it would be difficult for an undercover agent to gain the trust of any DTO member, particularly Belton, necessary to advance the investigation. (*Id*.) Officer Furman also stated that it would be dangerous for an undercover agent to attempt to infiltrate the Belton DTO due to Belton's connection to violent gangs in California. (*Id*.)

Officer Furman indicated that search warrants had been used to good effect in the investigation of Dennis and heroin trafficking in Cedar Rapids. (*Id*. at 58-59.) Officer Furman indicated that he considered a search warrant for Rogers's stash location but determined that such a search warrant would be premature and tip-off Belton and others to the investigation. (*Id*. at 59-60.) Further, Officer Furman opined that without specific knowledge, search warrants create only a random chance of discovering admissible evidence. (*Id*. at 61.) Additionally, Officer Furman stated that search warrants in and of themselves would not meet the objectives of the investigation because evidence seized would be linked to specific individuals rather than the organization at large. (*Id*. at 62.) Officer Furman opined that search warrants used in conjunction with intercepted communications is a more effective use of search warrants. (*Id*.)

Officer Furman explained that, while multiple interviews had been conducted during the investigation, the interviews had limited effectiveness in gathering information on the membership and operation of the Belton DTO. (*Id*.) Officer Furman noted that, after Dennis's arrest, in November 2021, he gave a proffer interview where he identified Belton as selling pounds of methamphetamine in Cedar Rapids. (*Id*. at 64-65.) Officer Furman stated that he also considered the use of grand jury subpoenas for financial records of members of the Belton DTO, but investigators had not identified the financial

29

institutions used by the Belton DTO. (*Id.* at 65-66.) Further, Officer Furman was skeptical that issuing grand jury subpoenas to individuals would be successful because subjects of the investigation would likely invoke their Fifth Amendment rights and would be unlikely to provide truthful testimony. (*Id.* at 66.) Officer Furman was also concerned that using grand jury subpoenas on lower-level DTO members would tip Belton and other higher-level members off to the investigation. (*Id.* at 66-67.)

Officer Furman indicated that, during the investigation, trash searches had proven to be unsuccessful. (*Id.* at 67-68.) Officer Furman also noted that Belton's primary residence was in California and wire interceptions of Belton's phone indicated that he did not handle the drugs, making trash searches of Belton's Iowa residence unlikely to yield evidence. (*Id.*) Officer Furman also indicated that the investigation had not yet revealed all the locations which may yield admissible evidence and investigators would continue to utilize trash searches when practicable. (*Id.* at 68-69.)

Officer Furman also outlined various other surveillance techniques used in the investigation such as pole cameras, vehicle trackers, and precision locators for TT7, TT10, TT13. (*Id.* at 69-71.) Like physical surveillance techniques, these other techniques revealed only general information and locations, not specific information regarding Belton, D. Mims, or other DTO members or criminal activity. (*Id.*)

Officer Furman indicated that the use of pen registers, trace devices, and toll analysis are all helpful and had been used in the investigation, but by themselves would not achieve the goals of the investigation. (*Id.* at 71-73.) Officer Furman explained that the information gained from a wiretap would be more specific and confirm the general information gleaned from pen registers, trace devices, and toll analysis. (*Id.*)

Officer Furman indicated that mail cover requests had been utilized for D. Mims and Rogers but had yet to yield any information pertinent to the investigation. (*Id.* at 73-74.)

Officer Furman noted that investigators had engaged in financial investigation and believed that portions of proceeds from drug sales were transported via passenger vehicles to the source of supply in California. (*Id.* at 75.) Investigators also learned that Belton used wire transfers to move money to DTO members in other states. (*Id.*) Officer Furman noted that Belton had on numerous occasions engaged in a high number of wire transfers to multiple recipients. (*Id.*) Officer Furman indicated that financial investigation alone would not be enough to fully understand the scope and extent of criminal activity by the DTO. (*Id.* at 75-76.)

Officer Furman concluded that electronic surveillance was likely the only means of investigation to fully expose the overall scope and extent of the criminal organization under investigation. (*Id.* at 76.) Officer Furman stated that the methods of investigation discussed in the affidavit had yielded limited success and appeared unlikely to succeed if tried or continued, or were too dangerous to employ, making the wiretaps the best method to achieve the goals of the investigation. (*Id.* at 76-77.)

### G. February 11, 2022 Affidavit

On February 11, 2022, Judge Williams authorized the interception of communications over TT13, used by Belton, TT14, used by Whitney, and TT15, used by D. Mims. (Doc. 16 in 21-wt-8-CJW.) Officer Furman provided an affidavit in support of the application for the wiretap explaining that there was probable cause to believe that Belton was using TT13, D. Mims was using TT15, and Whitney was using TT14 in connection with conspiracy to distribute controlled substances in violation of the Targeted Offenses. (Doc. 278-4 at 4-6.)

The pertinent target subjects identified in the affidavit were Belton, D. Mims, and Whitney. (*Id.* at 9-12.) In the affidavit, Officer Furman stated that, based on his training and experience, he believed Belton was the source of supply who coordinated the delivery of drugs from "Papa" in California to Cedar Rapids for distribution. (*Id.* at 9-10.)

31

Officer Furman stated that, based on his training and experience, he believed D. Mims was a member of the Belton DTO and he acted as the shipment coordinator and a leader of several distributors in the Cedar Rapids area. (*Id.* at 10-11.) Officer Furman stated that, based on his training and experience, he believed Whitney was a member of the Belton DTO and he was tasked with collecting money from distributors on behalf of Belton and D. Mims. (*Id.* at 11-12.) Officer Furman indicated that: (1) Belton used TT13 to discuss DTO operations and coordinate meetings with DTO members; (2) D. Mims used TT15 to discuss DTO operations and coordinate meetings with DTO members; and (3) Whitney used TT14 to conduct drug trafficking activities for the DTO and to collect drug proceeds from DTO distributors. (*Id.* at 20-21.) In the affidavit, Officer Furman sought permission to continue the interception of wire communications over TT13 and TT14 and to initiate interception of wire communications over TT15 to uncover the scope of the Belton DTO, identify DTO members, identify stash houses, and expand the investigation to other districts where the source of supply is believed to be located. (*Id.* at 23.)

In support of probable cause to issue the wiretaps over TT13, TT14, and TT15, Officer Furman's affidavit set forth the following facts:

On January 17, 2022, investigators intercepted a conversation between D. Mims and Chris Curley over TT10. (*Id.* at 25-26.) During the conversation, D. Mims informed Curley that he had lost his phone and that "the food's done too." (*Id.* at 25.) Officer Furman interpreted the conversation to mean that D. Mims would be using a new phone in the future and that he had drugs ready for Curley for distribution. (*Id.* at 26.)

On January 21, 2022, investigators intercepted a conversation between D. Mims and Tim Webber over TT10. (*Id.* at 23-24.) During the conversation, D. Mims told Webber, "we just do four hours of the rest and uh I still got you." (*Id.* at 23.) D. Mims also told Webber, "I'm about to hit you off a new number too." (*Id.* at 24.) Officer

Furman opined that D. Mims was discussing Webber owing a $4,000 payment for a prior shipment of methamphetamine and informing Webber that he had a new telephone number. (*Id.*)

On February 1, 2022, investigators intercepted text messages over TT10 between D. Mims and Bates. (*Id.* at 24.) Officer Furman indicated that the purpose of the text messages was to coordinate the purchase of methamphetamine. (*Id.* at 25.)

On January 26, 2022, investigators intercepted a call between Whitney and D. Mims over TT14, Whitney's phone. (*Id.* at 27-28.) D. Mims initiated the call using TT15. (*Id.* at 27.) Officer Furman opined that the primary purpose of the call was for D. Mims to inform Whitney that he was using a new telephone, TT15. (*Id.* at 28.)

On the same date, investigators intercepted a call between Whitney and Bates over TT14. (*Id.* at 30-31.) During the conversation, Bates asked Whitney, "Can you do half a jar or whatever you got?" (*Id.* at 30.) Whitney responded, "Yeah." (*Id.* at 31.) Officer Furman interpreted this conversation to mean that Bates was asking Whitney to purchase half of a pound of methamphetamine. (*Id.*) Officer Furman noted that investigators were not able to conduct surveillance to confirm that the meeting between Bates and Whitney occurred. (*Id.*)

On February 1, 2022, investigators intercepted a call and text messages between Whitney and an unidentified male over TT14. (*Id.* at 32-33.) Officer Furman interpreted the conversation and text messages as being for the purpose of coordinating the purchase of marijuana by the unidentified male from Whitney. (*Id.*) Similarly, on January 16, 2022, and, on February 6, 2022, investigators intercepted a call and text messages between Whitney and a different unidentified male over TT14. (Id. at 37-38.) Officer Furman opined that the purpose of the call and text messages was to coordinate the purchase of marijuana from Whitney. (*Id.*)

33

On February 4, 2022, investigators intercepted a call between Belton and Papa over TT13.  (*Id.* at 33-34.)  During the call, Belton asked Papa, "How much do they want for a whole one?"  (*Id.* at 33.)  Papa responded, "I'm not sure if that's what they were talking about but they're talking about like sixteen."  (*Id.*)  Belton asked, "Sixteen bands?" and Papa responded, "Yeah."  (*Id.* at 33-34.)  Belton stated, "Figure it out and let me know, I was thinking like twenty-five."  (*Id.* at 34.)  Officer Furman interpreted the conversation as Belton and Papa discussing the next purchase of drugs in California and the cost being $16,000.  (*Id.*)  Officer Furman noted that "bands" is a common term for $1,000 and "Sixteen bands" meaning $16,000.  (*Id.*)  Officer Furman also noted that Belton was telling Papa that he intended to purchase 25 pounds of methamphetamine, when he stated, "I was thinking like twenty-five."  (*Id.*)

On February 6, 2022, investigators intercepted a text exchange between Belton and an unidentified male over TT13.  (*Id.* at 34-35.)  Officer Furman indicated that the purpose of the text messages was to coordinate the purchase of methamphetamine.  (*Id.*)

On the same date, investigators intercepted a call between Whitney and an unidentified female over TT14.  (*Id.* at 35-36.)  During the conversation, the unidentified female stated, "I need some more of the[m] things, 100 of them things you got."  (*Id.* at 35.)  Whitney responded that, "Uh, I don't know if I got that many."  (*Id.*)  The unidentified female stated, "see what you got and call me back."  (*Id.*)  Officer Furman interpreted the conversation to mean that the unidentified female wanted to purchase 100 pills from Whitney.  (*Id.* at 35-36.)  Officer Furman noted that an hour after the initial call, the unidentified female called Whitney back to see if he had checked on the pills and Whitney told her that there were no pills left to sell to her.  (*Id.* at 36.)

On February 3, 2022, investigators intercepted a call between Belton and Papa over TT13.  (*Id.* at 38-39.)  During the conversation, Belton told Papa, "we got five left and we on our way."  (*Id.* at 38.)  Belton also stated, "We need like sixty."  Papa replied,

"I already got a good number for you." (*Id.*) Belton then stated, "It will probably be next week. We going to do it like last time." (*Id.*) Papa responded, "Yeah, with D-Mo?" and Belton stated "Yep."[10] (*Id.*) Officer Furman interpreted this call to mean that Belton and Papa were setting up the next purchase of drugs in California and Belton intended to buy 60 pounds of methamphetamine. (*Id.* at 39.)

Officer Furman believed that a continuance of the wiretaps on TT13, used by Belton, and TT14, used by Whitney, and the initiation of a wiretap on TT15, used by D. Mims, would substantially further the investigation and provide better insight into Belton's role, D. Mims's role, and Whitney's role in the DTO and the methamphetamine trafficking operation. (*Id.* at 39-44.) Officer Furman stated that interception of wire communications over TT13, TT14, and TT15 was necessary because: (1) normal investigative techniques had been tried and failed to fully achieve the goals of the investigation; (2) normal investigative techniques were reasonably unlikely to succeed if tried; and (3) certain investigative techniques were too dangerous to be tried. (*Id.* at 44.)

Officer Furman addressed the following investigative techniques:

Prior wiretaps involving telephones used by various members of the Dennis and Belton DTO, including Belton's phones, TT7 and TT13, D Mims's phone, TT10, and Whitney's phone, TT14, provided useful information regarding the drug trafficking organization under investigation. (*Id.* at 45-50.) Officer Furman noted that additional interception of TT13 and TT14 and initiation of interception TT15 would be useful for investigation into other members of the organization during the next distribution cycle. (*Id.* at 50.)

Investigators had used a confidential source ("CS") in the investigation. Specifically, a CS was used to purchase methamphetamine from Rogers, but he was

---

[10] D-Mo is a nickname for D. Mims. (Doc. 278-4 at 39.)

35

limited to providing only information about Rogers and no other DTO members, making his cooperation alone insufficient to achieve the goals of the investigation. (*Id.* at 50-51.) Officer Furman opined that, given Belton's use of multiple layers of lower-level DTO members, it would be unlikely that law enforcement could develop a CS capable of infiltrating the DTO at Belton's level. (*Id.* at 51.)

Officer Furman discussed the controlled purchases involving Rogers and the CS, noting that the controlled purchases allowed investigators to identify Rogers and his likely stash location, but did not elicit information about Rogers's connection to Belton and other members of the DTO. (*Id.* at 51-52.)

Officer Furman indicated that investigators had performed physical surveillance of known DTO members and learned some information regarding location, but surveillance alone had done little to expose the DTO or the purposes of the locations surveilled. (*Id.* at 52-61.) Additionally, cell site location technology and telephone precision technology were used to little effect, as they only gave general location information and lacked specific information of criminal activity. (*Id.* at 53.) Officer Furman indicated that he considered using tracking devices on vehicles used by Belton and other members of the DTO but determined it would be of little use as Belton lived primarily in California and tended to show up in Cedar Rapids unannounced, making knowledge of the vehicle Belton would be using in Cedar Rapids difficult to determine. (*Id.* at 54.) Investigators also conducted surveillance on Belton's Iowa residence, D. Mims's residence, and Whitney's residence, but only learned limited information related to vehicles used by various DTO and non-DTO members, particularly vehicles Bailey used to drive from California to deliver drugs in Iowa, where D. Mims sometimes took the vehicle from Bailey. (*Id.* at 54-60.) Officer Furman noted that the interception of various phones used by DTO members was helpful in identifying locations and individuals to surveil. (*Id.*) Further, Officer Furman noted that physical surveillance in

36

conjunction with intercepted conversations on TT13, TT14, and TT15 would help meet the objectives of the investigation, making surveillance much more productive. (*Id.* at 60-61.)

Officer Furman stated that investigators had not had the opportunity to introduce undercover law enforcement agents into the Belton DTO and Officer Furman did not believe that undercover agents would be feasible in the investigation. (*Id.* at 61-62.) Officer Furman explained that it would be difficult for an undercover agent to gain the trust of any DTO member, particularly Belton, necessary to advance the investigation. (*Id.*) Officer Furman also stated that it would be dangerous for an undercover agent to attempt to infiltrate the Belton DTO due to Belton's connection to violent gangs in California. (*Id.*)

Officer Furman indicated that search warrants had been used to good effect in the investigation of Dennis and heroin trafficking in Cedar Rapids. (*Id.* at 63-65.) Officer Furman indicated that he considered a search warrant for Rogers's stash location but determined that such a search warrant would be premature and potentially lead to drugs and other evidence being moved to other locations. (*Id.* at 65-66.) Further, Officer Furman opined that without specific knowledge, search warrants create only a random chance of discovering admissible evidence. (*Id.* at 66.) Additionally, Officer Furman stated that search warrants in and of themselves would not meet the objectives of the investigation because evidence seized would be linked to specific individuals rather than the organization at large. (*Id.*) Officer Furman believed that search warrants used in conjunction with intercepted communications was a more effective use of search warrants. (*Id.*)

Officer Furman explained that, while multiple interviews had been conducted during the investigation, the interviews had limited effectiveness in gathering information on the membership and operation of the Belton DTO. (*Id.* at 67-68.) Officer Furman

37

noted that, after Dennis's arrest, in November 2021, he gave a proffer interview where he identified Belton as selling pounds of methamphetamine in Cedar Rapids. (*Id.* at 69.) Officer Furman stated that he also considered the use of grand jury subpoenas for financial records of members of the Belton DTO, but investigators had not identified the financial institutions used by the Belton DTO. (*Id.* at 70.) Further, Officer Furman was skeptical that issuing grand jury subpoenas to individuals would be successful because subjects of the investigation would likely invoke their Fifth Amendment rights and would be unlikely to provide truthful testimony. (*Id.* at 71.) Officer Furman was also concerned that using grand jury subpoenas on lower-level DTO members would tip Belton and other higher-level members off to the investigation and Belton and other DTO members would act to impede the investigation. (*Id.* at 71-72.)

Officer Furman indicated that, during the investigation, trash searches have proven to be unsuccessful. (*Id.* at 72-74.) Officer Furman also noted that Belton's primary residence was in California and wire interceptions of Belton's phone indicated that he did not handle the drugs, making trash searches of Belton's Iowa residence unlikely to yield evidence and possibly tip-off Belton to the investigation. (*Id.* at 73.) Officer Furman also indicated that the investigation had not yet revealed all the locations which may yield admissible evidence and investigators would continue to utilize trash searches when practicable. (*Id.* at 73-74.)

Officer Furman also outlined various other surveillance techniques used in the investigation such as pole cameras, vehicle trackers, and precision locators for TT7, TT10, TT13. (*Id.* at 74-77.) Like physical surveillance techniques, these other techniques revealed only general information and locations, not specific information. (*Id.*) However, Officer Furman indicated that these surveillance techniques combined with interception of wire communications allowed investigators to confirm travel between Iowa and California involving DTO members. (*Id.*)

38

Officer Furman indicated that the use of pen registers, trace devices, and toll analysis had all been helpful in the investigation, but by themselves, such investigative techniques would not achieve the goals of the investigation. (*Id.* at 77-78.) Officer Furman explained that the information gained from a wiretap would be more specific and confirm the general information gleaned from pen registers, trace devices, and toll analysis. (*Id.*)

Officer Furman indicated that mail cover requests had been utilized for D. Mims and Rogers but had not revealed any information pertinent to the investigation. (*Id.* at 79-80.)

Officer Furman noted that investigators had engaged in financial investigation and believed that portions of proceeds from drug sales were transported via passenger vehicles to the source of supply in California. (*Id.* at 81.) Investigators also learned that Belton used money wire transfers to move money to DTO members in other states. (*Id.*) Officer Furman noted that Belton had on numerous occasions engaged in a high number of wire transfers to multiple recipients. (*Id.*) Officer Furman indicated that financial investigation alone would not be enough to fully understand the scope and extent of criminal activity by the DTO. (*Id.*)

Officer Furman concluded that electronic surveillance was likely the only means of investigation to fully expose the overall scope and extent of the criminal organization under investigation. (*Id.* at 82.) Officer Furman stated that the methods of investigation discussed in the affidavit had yielded limited success and appeared unlikely to succeed if tried or continued, or were too dangerous to employ, making the wiretaps the best method to achieve the goals of the investigation. (*Id.*)

## III. DISCUSSION

### A. The Parties' Arguments

#### 1. Belton's Arguments

Belton argues that the wiretaps authorized on May 21, 2021, November 29, 2021, January 13, 2022, and February 11, 2022 all lacked sufficient probable cause. (Doc. 256-1 at 8.) Specifically, Belton argues that Officer Furman's May 21, 2021 affidavit contains minimal evidence of criminal conversations regarding drug trafficking, including two intercepted conversations between Belton and Rogers over Rogers's phone, TT6, which discuss picking something up and bringing it to Belton. (*Id.* at 9-10.) Belton asserts that "[i]t seems much more likely" that in the conversations "Rogers is simply telling Mr. Belton that he is coming over to his house" and "[t]hough he is apparently picking something up to bring it over to Mr. Belton's house, there is no indication within these phone calls that it has anything to do with the drug trade." (*Id.* at 10.) Belton also argues that Griffin, who, in a post-*Miranda* interview, identified Belton as his source for methamphetamine, told investigators that he called Belton at a different phone number than the TT7 phone number which was the phone identified in the wiretap application and Officer Furman's affidavit. (*Id.* at 11.) Belton maintains that, based on the foregoing information, the affidavit did not "support the allegation that criminal conversations would be heard on TT7." (*Id.*) Similarly, Belton points out that Bates, who told investigators that he purchased methamphetamine from Belton, also told investigators that he did not contact Belton via telephone. (*Id.*)

With regard to the November 29, 2021 affidavit, Belton argues that information that is identical or nearly identical to the May 21, 2021 affidavit cannot provide sufficient probable cause. (*Id.* at 13.) Belton also argues that new information derived from the illegal wiretap issued on May 21, 2021 is tainted and cannot be used to support probable cause for the November 29, 2021 application and affidavit. (*Id.*)

With regard to the January 13, 2022 affidavit, Belton makes the same arguments as were made in the November 29, 2021 affidavit. Additionally, Belton notes that there is an intercepted conversation that references firearms but argues that "it does not have anything to do with the drug trade and the purpose of this [wiretap] request is to gather information about the drug trade and not firearms." (*Id.* at 15.)

Finally, with regard to the February 11, 2022 affidavit, Belton makes the same general arguments that were made in the November 29, 2021 and January 13, 2022 affidavits. (*Id.* at 15-16.)

Belton also argues that all four affidavits for the wiretap applications did not "adequately establish that normal investigative techniques could not have been used in lieu of wiretaps." (*Id.* at 16.) Belton contends that "[t]here were other investigative procedures that were either simply not attempted with regards to Mr. Belton or were inadequately pursued." (*Id.* at 22.)

## 2. *The Government's Response to Belton*

In its resistance, the Government argues that, viewed in its entirety, the May 21, 2021 affidavit "stated more than sufficient probable cause to believe that Belton was involved in the Target Offenses, that he was the user of [TT7], and that he would be using [TT7] to conduct drug business during the period of the interception in May 2021." (Doc. 273 at 31.) With regard to the other three affidavits, the Government maintains that reliance on information gained from prior wiretaps is not fatal to any of the affidavits or wiretap applications because all four affidavits and applications for wiretaps, starting with the May 21, 2021 affidavit, were supported by probable cause. (*Id.* at 32-35.) As to the issue of firearms in the January 13, 2022 affidavit, the Government asserts that the January 13, 2022 affidavit included violations of 18 U.S.C. Section 922(g) (prohibited person in possession of a firearm) as a Target Offense, and therefore, communications about firearms supported probable cause. (*Id.* at 34.)

41

### 3.     D. Mims's Arguments

D. Mims argues that he came to the attention of investigators when he was overheard on a wiretap of Dennis's phone.  (Doc. 259-1 at 8.)  D. Mims notes that investigators heard D. Mims ask "Dennis, 'you headin' out with us' and Dennis later saying, 'my money ready, my money all packaged up. . . .'"  (*Id.* at 8-9.)  D. Mims contends that "[t]his is too slight a showing to satisfy the probable cause requirements o[f] the Fourth Amendment and Title III" and the "evidence obtained from the February 13, 2021, and March 25, 2021, wiretaps must be suppressed."[11]  (*Id.* at 9.)  Further, D. Mims argues that evidence obtained from the subsequent wiretaps (May 21, 2021, November 29, 2021, January 13, 2022, and February 11, 2022) must also be suppressed as tainted, "to the extent such wiretaps were based on the earlier wiretaps."  (*Id.*)  D. Mims points out that "virtually all the alleged probable cause stem from wiretap evidence alone" and there "is nothing corroborative," as investigators never found D. Mims "in possession of controlled substances.  Not on his person, or in his car, or in his home."  (*Id.*)  D. Mims also argues that investigators failed to use or even attempt to use "other commonly used investigative techniques" as the investigation related to him.  (*Id.* at 10-11.)

### 4.     The Government's Response to D. Mims

In its resistance, the Government notes that D. Mims's probable cause argument focuses on "applications to intercept communications occurring over Brian Dennis's phones in early 2021 . . . and his phone (identified as Target Telephone 4) on March 25 2021."  (Doc. 273 at 35.)  The Government asserts that D. Mims's focus on the February 22, 2021 and March 25, 2021 wiretaps is misplaced because the wiretap of TT4 (March 25, 2021 application) did not result in the interception of any communications and the

---

[11] There is no February 13, 2021 affidavit, the Court presumes that, given the citation, D. Mims is referring to the February 22, 2021 affidavit.

wiretap was shut down within the first two weeks and because D. Mims does not argue that there was no probable cause to intercept Dennis's phones (February 22, 2021 application). (*Id.* at 35-36.) The Government argues that D. Mims "does not assert any grounds in § 2518(10)(a) apply as to the Dennis wires" and therefore D. Mims "has not stated a valid basis to suppress his communications from the Dennis wiretaps." (*Id.* at 36.) As to the other wiretaps, the Government contends that, because D. Mims has "failed to show any initial illegally intercepted communications, there is no issue with derivative taint." (*Id.* at 37.)

### 5. *Whitney's Arguments*

Whitney argues that the January 13, 2022 wiretap application and affidavit fail to establish probable cause. (Doc. 244 at 4.) Whitney contends that, as they relate to his phone communications, "the allegations made within the four corners of the affidavit are largely conclusory, speculative, and unsupported by facts." (*Id.* at 6.) Whitney argues that the application and affidavit are "premised entirely on one brief text exchange and one brief conversation in December 2021, neither of which mention money or drugs." (*Id.* at 13.) Whitney maintains that "[t]he scant, ambiguous evidence recited in the affidavit falls far short of supplying the 'specific information' upon which probable cause must be based." (*Id.*) Further, Whitney argues that "[w]hen the evidence obtained from the January wiretap warrant is excised, probable cause does not exist for the February warrant." (*Id.* at 17.) Whitney maintains that "[s]ince the January application failed to state probable cause, recitation of the same unsupported opinions in the February application also cannot support probable cause" and, therefore, all evidence obtained from the February 2022 wiretap must be suppressed. (*Id.*) Whitney also argues that evidence seized from a search of his residence, the seizure and testing of his urine, and statement made to law enforcement after his residence was searched must all be suppressed as fruits of the unlawful wiretap evidence. (*Id.* at 19-20.) Finally, Whitney

43

argues that Officer Furman's affidavits "failed to establish that normal investigative procedures could not have been used in lieu of wiretaps." (*Id.* at 21-26.)

### 6. The Government's Response to Whitney

In its resistance, the Government argues that Whitney incorrectly focuses on specific statements in isolation to argue that probable cause was lacking, instead of considering the larger context of the affidavits which support probable cause to issue the wiretaps. (Doc. 273 at 37.) The Government also asserts that the Court, when considering whether to issue the wiretaps, was "entitled to credit [Officer Furman's] interpretation of the slang used, particularly in the context of the larger investigation." (*Id.*)

### 7. E. Mims's Arguments

E. Mims essentially argues that evidence related to him which was obtained from the May 21, 2021, November 29, 2021, December 21, 2021, and January 13, 2022 wiretaps should be suppressed because the wiretaps were not necessary. (Doc. 245-2 at 1-4.) Specifically, E. Mims argues that Officer Furman's affidavits "describe an investigation which was successfully using a wide variety of normal investigative techniques" and had investigators continued to use such investigative techniques, the investigation "would likely have succeeded" without the issuance of wiretaps. (*Id.* at 8.)

### 8. The Government's Response to E. Mims

The Government does not specifically address E. Mims's arguments. However, the Government, in general terms, addresses the issue of necessity raised by E. Mims and the other Defendants. The Government asserts that the necessity requirement was met for each application and affidavit. (Doc. 273 at 40.) The Government maintains that "[u]niformly, the [D]efendants' arguments against necessity amount to second-guessing the effectiveness of the investigators' use or declination to use the various methods listed in the affidavits." (*Id.*) The Government points out that "[e]ach affidavit

at issue included extensive discussions of the investigative methods that were tried, why they were not successful in achieving the goals of the investigation" and "[i]f methods of investigation were not tried," why such methods appeared unlikely to succeed or were too dangerous to attempt. (*Id.*)

## B. Relevant Law

### 1. The Statute

Pursuant to 18 U.S.C. § 2518(3), to obtain a wiretap, the Government must establish the following:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> (d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

*Id.*

### 2. Probable Cause

"[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. [The issuing judge]'s determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation and internal quotation marks omitted). "In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of

45

probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam)); *see also United States v. Macklin*, 902 F.2d 1320, 1324 (8th Cir. 1990) (providing that a reviewing court "does not conduct a *de novo* review of the issuing judge's determination, but must instead afford it great deference"); *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) ("[T]he decision to issue the warrant is to be upheld if supported by substantial evidence on the record."). Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 238–39).

In *United States v. Perez-Trevino*, 891 F.3d 359 (8th Cir. 2018), the Eighth Circuit Court of Appeals set forth the probable cause analysis under Section 2518:

> Section 2518 requires a two-step probable cause analysis. First, there must be probable cause that an individual has committed, is committing, or is about to commit a crime listed in 18 U.S.C. § 2516. 18 U.S.C. § 2518(3)(a). Second, the application must show probable cause that "particular communications" relating to the specific offense will be obtained from the interception of the communication. 18 U.S.C. § 2518(3)(b).

*Id*. at 368. The Eighth Circuit has "long held that the 'statutory probable cause standards set out in Title III are co-extensive with the constitutional requirements embodied in the fourth amendment.'" *United States v. Gaines*, 639 F.3d 423, 430 (8th Cir. 2011) (quoting *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988)); *see also Macklin*, 902 F.2d at 1324 ("The probable cause showing required by section 2518 for electronic surveillance does not differ from that required by the fourth amendment for a

46

search warrant."). Thus, "to grant an application for a wiretap, district courts must make a 'practical, common-sense decision whether,' considering the 'totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Thompson*, 690 F.3d 977, 984 (8th Cir. 2012) (quoting *Gates*, 462 U.S. at 238). "As 'a practical and common-sens[e] standard,' probable cause leaves plenty of room to draw reasonable 'inferences' from less-than-perfect evidence." *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (quoting *Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020)) (alteration in original). In particular, when determining whether there is probable cause to support a Title III interception of a cellphone, the court must determine, "when considering the totality of the circumstances, that there was a fair probability that the cellphone was used or was about be used for criminal activities or that [the target individual], a person engaged in proscribed conduct, commonly used the cellphone." *United States v. Merrett*, 8 F.4th 743, 750 (8th Cir. 2021); *see also James*, 3 F.4th at 1105 ("[P]robable cause is about fair probabilities, not near certainties.") (quotation omitted). "In determining probable cause [courts] are bound to consider only the facts contained within the four corners of the affidavit." *United States v. Milton*, 153 F.3d 891, 894 (8th Cir. 1998).

### 3. Necessity

18 U.S.C. Section 2518(3)(c) requires a finding of necessity for a wiretap. *Merrett*, 8 F.4th at 749. The necessity requirement "prevents the government from routinely using wiretaps 'as the initial step in an investigation.'" *Perez-Trevino*, 891 F.3d at 370 (quoting *United States v. Colbert*, 828 F.3d 718, 725 (8th Cir. 2016)). "Wiretaps should be authorized only when necessary, but in drafting an affidavit in support of a wiretap application, investigators 'need not explain away all possible alternative techniques.'" *United States v. Campbell*, 986 F.3d 782, 793 (8th Cir. 2021) (quoting *United States v. Garcia*, 785 F.2d 214, 223 (8th Cir. 1986)). Further, the

47

Eighth Circuit has repeatedly held that "the necessity requirement does not mandate that the government 'exhaust all possible techniques before applying for a wiretap.'" *Colbert*, 828 F.3d at 725 (quoting *Macklin*, 902 F.2d at 1326-27). "To meet the necessity requirement, law enforcement must 'establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator.'" *Merrett*, 8 F.4th at 749 (quoting *Campbell*, 986 F.3d at 793, in turn quoting *United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015)); *see also United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994) (finding wiretap necessary where use of conventional investigative methods did not reveal the scope of the suspected conspiracy or did not develop enough evidence to successfully prosecute the suspected coconspirators). The Eighth Circuit has explained that:

> An affidavit that explains "in general terms why some of the procedures have failed in other investigations and would likely fail in this case," satisfies § 2518(1)(c) if it contains "particular instances in which normal procedures were used and did in fact fail." *Macklin*, 902 F.2d at 1327. The affidavit's use of explanations that "are common to most drug conspiracy investigations . . . does not necessarily preclude a finding of necessity under section 2518(1)(c)." [*United States v.*] *Thompson*, 210 F.3d [855,] 859 [(8th Cir. 2000)] ("[A]lthough the affidavit's assertions of inadequacy 'might appear boilerplate, the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing.'" (quoting *United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998))).

*Colbert*, 828 F.3d at 726 (fourth alteration in original). "The issuing judge determines 'in a commonsense manner' whether the necessity requirement is met." *Perez-Trevino*, 891 F.3d at 370 (citation omitted).

48

*C.*     *Analysis*

    *1.*     *Probable Cause*

        *a.*     *Belton*

In the May 21, 2021 affidavit, Officer Furman recounted a post-*Miranda* interview by law enforcement with Nicholas Griffin that occurred on January 7, 2021. (Doc. 278 at 31-33.) During the interview, Griffin identified Belton, who he referred to as "David" or "Blood," Belton's street name, as his source for methamphetamine. (*Id*. at 31.) Griffin also told investigators that Belton distributed narcotics in Cedar Rapids and Belton's source of supply was in California, where members of Belton's family reside. (*Id*.) Griffin identified the phone number 319-640-XXXX, TT7, as belonging to Belton and was the number he called to contact Belton regarding the purchase of drugs. (*Id*. at 31-32.) The TT7 number was in Griffin's phone and Griffin identified a picture of Belton as the individual he knew as David or "Blood" and who was his source of methamphetamine. (*Id*. at 31-32.) Investigators conducted a toll analysis of the TT7 number used by Belton and discovered 54 contacts between Griffin and Belton between December 4, 2020 and January 5, 2021. (*Id*. at 32.) Griffin told investigators that he purchased weights of 3 pounds, 4 pounds, 3 pounds, and 5 pounds of methamphetamine from Belton in 2020. (*Id*.) Griffin confirmed the foregoing information during a federal proffer interview on March 3, 2021. (*Id*. at 32-33.)

On March 2, 2021, investigators intercepted a call over TT1, belonging to Dennis, in which Dennis and Allen discussed Belton (a/k/a "Blood") being the source for drugs and Dennis being upset that Belton was not providing him drugs. (*Id*. at 33-34.) On the same date, investigators intercepted a call over TT1 between Dennis and D. Mims, where D. Mims asked Dennis if he was joining Belton and D. Mims in traveling to the source location to acquire more drugs. (*Id*. at 34-36.)

49

On March 29, 2021, Bates was interviewed by law enforcement. (*Id.* at 37-38.) During the interview, Bates told investigators that he purchased methamphetamine from "Blood." (*Id.* at 38.) Bates stated that, for approximately 8 months prior to being placed on probation, he purchased pound quantities of methamphetamine from Belton at $3,000 per pound once or twice per week. (*Id.*) Bates also told investigators that Belton was from California and was not always in Cedar Rapids. (*Id.*) A toll analysis of TT7 showed one contact between Bates and TT7 on May 1, 2021. (*Id.*)

On April 11, 2021, while monitoring the pen register on TT7, investigators noted eight contacts between Belton and Whitney. (*Id.* at 40.) On April 16, 2021, investigators intercepted a call over TT6 between Rogers and Whitney, where Whitney told Rogers, "Bro told me to hit you for the ten pack," which Officer Furman interpreted to mean Belton instructed Whitney to collect a $10,000 drug debt from Rogers. (*Id.* at 41-42.) On April 17, 20201, investigators intercepted another call between Rogers and Whitney, where Whitney, again, discussed Rogers owing Belton $10,000 for the drug debt. (*Id.* at 42-43.) During the conversation, Rogers indicated that he had paid Belton $2,000 and had $4,500 to pay toward the debt, which Whitney intended collect. (*Id.*) On April 19, 2021, investigators intercepted another call between Rogers and Whitney regarding the collection of money for Belton. (*Id.* at 43-44.) During the conversation, Rogers admitted that he did not have the money, but stated that he talked to "Bro," who Officer Furman indicated referred to Belton, and straightened things out. (*Id.*) On May 1, 2021, investigators intercepted two calls between Rogers and Belton over TT6, where the incoming calls came from TT7. (*Id.* at 45-47.) Again, Officer Furman interpreted these calls to be for the purpose of Belton collecting the drug debt from Rogers. (*Id.*)

A toll analysis of TT7 from April 11, 2021 to May 11, 2021 revealed 20 calls between TT7 and Whitney and six calls between TT7 and Rogers. (*Id.* at 49.)

Based on the foregoing, and, when considering the totality of the circumstances, I find that the May 21, 2021 affidavit establishes probable cause, because the information in the affidavit establishes a fair probability that Belton was committing the Target Offenses and that Belton was using TT7 in furtherance of the Target Offenses. *See Merrett*, 8 F.4th at 750. Furthermore, to the extent that Belton complains that the various intercepted conversations presented in the affidavit lacked direct discussion of drugs or narcotics trafficking activities, the argument lacks merit. A finding of probable cause "is not disturbed because many of the conversations were in vague or coded language. A court is justified in relying on an expert's opinion as to evidence in a wiretap application[.]" *United States v. Bellomo*, 954 F.Supp. 630, 638 n.3 (S.D.N.Y. 1997). I find that Officer Furman provided credible interpretations of the content of the conversations discussed in the affidavit. "It would defeat the purpose of the wiretap statute to allow criminals to avoid detection simply by using nicknames and code to disguise their activities." *Id*.

To the extent that Belton complains that Griffin used a different phone number to call Belton than the number associated with TT7, Belton's complaint is misplaced. In the affidavit, Officer Furman explained that, on March 24, 2021, investigators realized that Belton had discontinued using the number that Griffin used to contact Belton and began using the number associated with TT7. (Doc. 278 at 11.) Investigators noted that the new number associated with TT7 was assigned to the same IMEI as the previously known number used by Belton. (*Id*.) Additionally, because Belton had only changed phone numbers and not the device, investigators conducted a common call analysis and identified 50 common callers between the two telephone numbers. (*Id*.) Based on the foregoing, I find that there was probable cause to believe TT7 was used by Belton in furtherance of the Targeted Offenses. Similarly, the fact that Bates generally did not contact Belton via telephone does not appreciably detract from the totality of the

circumstances contained in the affidavit in support of probable cause. Accordingly, I find that there was probable cause to issue the wiretap of TT7 on May 21, 2021.

In the November 29, 2021 affidavit, paragraphs 23, 28-31, and 34-36 are identical or nearly identical recitations of the information in the May 21, 2021 affidavit concerning Griffin, interceptions of TT1 involving Dennis and D. Mims discussing Belton as a drug source, Bates, and conversations between Belton and Rogers. (Doc. 278-1 at 15, 17-20, 22-24.) Additionally, in the November 29, 2021 affidavit, Officer Furman recounted information derived from intercepted conversations and text messages over TT7 from the May 21, 2021 wiretap order. (*Id.* at 24-37.) On May 21, 2021, investigators intercepted a call over TT7 between Belton and D. Mims discussing the location of drug proceeds and Belton needing access to some of it to pay his mother and an unidentified individual. (*Id.* at 24-26.) On the same date, investigators intercepted a call over TT7 between Belton and Whitney discussing the location of narcotics. (*Id.* at 26.) On May 24, 2021, investigators intercepted a call over TT7 between Belton and D. Mims where they discussed an unidentified individual who owed Belton money for drugs. (*Id.* at 28-31.) On May 24, 2021, investigators intercepted a call over TT7 between Belton and Whitney where Whitney asked about a price increase for drugs from $4,000 to $5,000. (*Id.* at 31-33.) On June 14, 2021, investigators intercepted a call over TT7 between Belton and Papa regarding Belton's drug supply and Belton only having ten pounds of methamphetamine remaining. (*Id.* at 33-35.) Papa also inquired whether someone would be traveling to California to obtain more methamphetamine. (*Id.*) Investigators also reviewed text messages between Belton and Papa over TT7, where Papa informed Belton of a new phone number for Papa and where Belton wanted to talk to Papa after he did not reply to two earlier texts. (*Id.* at 36-37.)

Like the May 21, 2021 affidavit, when considering the totality of the circumstances, I find that the November 29, 2021 affidavit establishes probable cause, as

the information in the affidavit establishes a fair probability that Belton was committing the Target Offenses and that Belton was using TT7 in furtherance of the Target Offenses. *See Merrett*, 8 F.4th at 750. Because I found that the May 21, 2021 affidavit established probable cause, Belton's argument that similar information between the May 21, 2021 affidavit and November 29, 2021 affidavit lacks probable cause is without merit. Similarly, the information that investigators learned from the May 21, 2021 wiretap order was not derived from an illegal wiretap and therefore was properly considered in granting the November 29, 2021 wiretap. Finally, like the May 21, 2021 affidavit, in finding that this affidavit established probable cause, I find that Officer Furman provided credible interpretations of the content of the conversations discussed in the November 16, 2021 affidavit. *See Bellomo*, 954 F.Supp. at 638 n.3. Accordingly, I find that there was probable cause to continue the wiretap of TT7 on November 29, 2021.

During the investigation, law enforcement learned in December 2021 that Belton began using TT13 and in the January 13, 2022 application sought a wiretap for TT13. (Doc. 278-3 at 19.) In the January 13, 2022 affidavit, paragraph 27 regarding Bates is identical or nearly identical to the information provided in the May 21, 2021 and November 29, 2021 affidavits. (*Id.* at 22-23.) Additionally, in the January 13, 2022 affidavit, Officer Furman recounted information derived from intercepted conversations and text messages over TT7 from the November 29, 2021 wiretap order. (*Id.* at 23-25, 27-29.) On December 9, 2021, Belton exchanged text messages with an unidentified male over TT7 regarding the progress of drug sales by the unidentified male. (*Id.* at 23.) The text messages indicated that 3 pounds of methamphetamine had been sold and the unidentified male was going to start selling the fourth pound of methamphetamine. (*Id.*) On December 9, 2021, investigators intercepted a conversation between Belton and an unidentified male over TT7 discussing the collection of $25,000 in drug proceeds from methamphetamine fronted to others. (*Id.* at 24-25.) On December 26, 2021,

53

investigators intercepted a call between D. Mims and Belton over TT10, the phone used by D. Mims, with the call being received by Belton over TT13.  (*Id.* at 27-29.)  During the conversation, Belton and D. Mims discussed the purchase of firearms.  (*Id.*)

Like the May 21, 2021 affidavit and the November 29, 2021 affidavit, based on the foregoing, and, when considering the totality of the circumstances, I find that the January 13, 2022 affidavit establishes probable cause, because the information in the affidavit establishes a fair probability that Belton was committing the Target Offenses and that Belton was using or would be using TT13 in furtherance of the Target Offenses.  *See Merrett*, 8 F.4th at 750.  Because I found that the May 21, 2021 affidavit and November 29, 2021 affidavit both established probable cause, Belton's argument that similar information between the May 21, 2021 and November 29, 2021 affidavits and January 13, 2022 affidavit lacks probable cause is without merit.  Similarly, the information that investigators learned from the May 21, 2021 wiretap order and the November 29, 2021 wiretap order was not derived from illegal wiretaps and therefore was properly considered in granting the January 13, 2022 wiretap.  Furthermore, to the extent that Belton argues that the discussion of firearms in the January 13, 2022 affidavit is not supportive of probable cause, Belton is incorrect.  One of the Targeted Offenses in the January 13, 2022 affidavit was possession of a firearm by a prohibited person (18 U.S.C. § 922(g)).  (Doc. 278-3 at 4.)  Finally, like the May 21, 2021 affidavit and the November 29, 2021 affidavit, in finding that the instant affidavit established probable cause, I find that Officer Furman provided credible interpretations of the content of the conversations discussed in the January 13, 2022 affidavit.  *See Bellomo*, 954 F.Supp. at 638 n.3.  Accordingly, I find that there was probable cause for the wiretap of TT13 on January 13, 2022.

In the February 11, 2022 affidavit, Officer Furman recounted a call between Belton and Papa that investigators intercepted on February 4, 2022.  (*Id.* at 33-34.)

During the conversation, Belton and Papa discussed the next purchase of drugs in California. (*Id.*) They discussed cost ($16,000) and quantity (25 pounds) for the next drug purchase. (*Id.*) On February 6, 2022, investigators intercepted text messages between Belton and an unidentified male over TT13. (*Id.* at 34-35.) Officer Furman opined that the purpose of the text messages was the acquisition of drugs by the unidentified male from Belton. (*Id.*) In the February 11, 2022 affidavit, Officer Furman also noted that, on February 6, 2022, Whitney sent a text to TT13 providing D. Mims's new phone number, TT15, to Belton. (*Id.* at 36-37.) Approximately four minutes after the text from Whitney, Belton, using TT13, called D. Mims at the new number, TT15. (*Id.*) On February 3, 2022 and February 10, 2022, investigators intercepted text messages between Belton and Papa over TT13, discussing an upcoming drug purchase in California. (*Id.* at 38-39.)

Like the May 21, 2021, November 29, 2021, and January 13, 2022 affidavits, based on the foregoing, and, when considering the totality of the circumstances, I find that the February 11, 2022 affidavit establishes probable cause, because the information in the affidavit establishes a fair probability that Belton was committing the Target Offenses and that Belton was using TT13 in furtherance of the Target Offenses. *See Merrett*, 8 F.4th at 750. Furthermore, the information that investigators learned from the May 21, 2021 wiretap order, the November 29, 2021 wiretap order, and the January 13, 2022 wiretap order was not derived from illegal wiretaps and therefore was properly considered in granting the February 11, 2022 wiretap. Finally, like the May 21, 2021, November 29, 2021, and January 13, 2022 affidavits, in finding that the present affidavit established probable cause, I find that Officer Furman provided credible interpretations of the content of the conversations discussed in the February 11, 2022 affidavit. *See Bellomo*, 954 F.Supp. at 638 n.3. Accordingly, I find that there was probable cause to continue the wiretap of TT13 on February 11, 2022.

55

####### b.    *D. Mims*

D. Mims probable cause argument focuses on the February 22, 2021 affidavit and the March 25, 2021 affidavit. (Doc. 259-1 at 8-9.) The February 22, 2021 affidavit was in reference to TT1, the phone used by Dennis. D. Mims makes no argument that the affidavit in support of the application for a wiretap of Dennis's phone lacked probable cause. D. Mims appears to complain that D. Mims came to the attention of investigators based on phone conversations that were intercepted over TT1. (*Id.* at 8.) Specifically, D. Mims states that, "[w]hen the Drug Task Force began its investigation into other individuals, [D. Mims] was not on anyone's radar scope" and he "first came to the attention of investigators when he was overheard on a wiretap of . . . Dennis's cell phone." (*Id.*) This all may be true, but none of this casts doubt on the probable cause to order a wiretap of TT1, Dennis's phone.

In the March 25, 2021 affidavit, Officer Furman sought a continuation of the wiretap of TT1 and a wiretap of TT4, a phone belonging to D. Mims. The problem with D. Mims's argument on this issue is that, on April 7, 2021, due to a lack of activity occurring on TT4, investigators requested that the interception software be uninstalled from TT4 and interceptions ceased. (Doc. 12 in 21-wt-1-CJW at 4, 15-17.) Thus, whether there was probable cause to order a wiretap of TT4 is irrelevant as the interception of TT4 between March 25, 2021 and April 7, 2021 did not result in the interception of any drug-related conversations during the monitoring period. (*Id.* at 16.)

As to the other affidavits (May 21, 2021, November 29, 2021, December 21, 2021, January 13, 2022, and February 11, 2022), D. Mims simply argues that "the Court should suppress as tainted any evidence obtained from the subsequent [wiretap orders] . . . to the extent such wiretaps were based on the earlier wiretaps." (Doc. 259-1 at 9.) Because probable cause exists for the February 22, 2021 affidavit related to Dennis's phone, and, because no criminal evidence was obtained from the March 25, 2021 wiretap,

the subsequent affidavits and wiretaps orders are not tainted based on the February 22, 2021 and March 25, 2021 affidavits and wiretap orders. Furthermore, the May 21, 2021 affidavit and November 29, 2021 affidavit were both only related to TT7, Belton's phone. Moreover, as discussed above, I have determined that, based on the May 21, 2021 and November 29, 2021 affidavits, there was probable cause to issue the May 21, 2021 and November 29, 2021 wiretap orders. Like the February 22, 2021 affidavit and the March 25, 2021 affidavit, neither the May 21, 2021 affidavit nor the November 29, 2021 affidavit are relevant to D. Mims.

While not discussed or argued in detail in D. Mims's brief, I have reviewed the December 21, 2021 affidavit, January 13, 2022 affidavit, and February 11, 2022 affidavit and find that the affidavits established probable cause for the issuance of wiretaps on TT10 and TT15. In the December 21, 2021 affidavit, Officer Furman recounted multiple intercepted calls from TT7 (Belton's phone) to TT10 (D. Mims's phone) regarding coordination of delivery of drugs from California to Iowa. (Doc. 278-2 at 18-22.) Officer Furman also recounted surveillance on D. Mims which investigators believed revealed a stash house used by D. Mims. (*Id.* at 25-26.) Investigators determined that immediate seizure of drugs at the stash house would expose and impede the ongoing investigation of the DTO. (*Id.* at 26.) Investigators also intercepted a series of calls and texts between Belton and D. Mims regarding Belton's arrival in Cedar Rapids after the drugs had arrived from California. (*Id.* at 26-28.) In the January 13, 2022 affidavit, Officer Furman recounted an intercepted call between D. Mims and Belton over TT10, where they discussed the purchase of firearms. (Doc. 278-3 at 27-29.) Investigators also intercepted a call between D. Mims and Whitney discussing the collection of drug proceeds. (*Id.* at 29-31.) Another intercepted call between D. Mims and Bailey over TT10 involved a conversation regarding an upcoming trip to California to acquire drugs. (*Id.* at 31-34.) Officer Furman also outlined intercepted text exchanges between D. Mims

and Timothy Webber discussing the purchase of methamphetamine and later payment for the fronted methamphetamine. (*Id.* at 34-35.) Finally, investigators intercepted a call between D. Mims and an unidentified male discussing the purchase of marijuana. (*Id.* at 35-37.) In the February 11, 2022 affidavit, Officer Furman recounted various text exchanges and phone calls between D. Mims and Webber, D. Mims and Bates, and D. Mims and Curley discussing drug purchases, collection of money for drugs and D. Mims informing the other that he would be using a new phone number, TT15. (Doc. 278-4 at 23-26.) Investigators identified TT15 during an intercepted call between D. Mims and Whitney over Whitney's phone, TT14. (*Id.* at 27-30.)

Based on the foregoing, and, when considering the totality of the circumstances, I find that the December 21, 2021 affidavit, January 13, 2022 affidavit, and the February 11, 2022 affidavit all establish probable cause, as the information in the affidavits establish a fair probability that D. Mims was committing the Target Offenses and that D. Mims was using TT10 and TT15 in furtherance of the Target Offenses. *See Merrett*, 8 F.4th at 750. Furthermore, the information that investigators learned from the May 21, 2021 wiretap order, the November 29, 2021 wiretap order, and the January 13, 2022 wiretap order was not derived from illegal wiretaps and therefore was properly considered in granting the wiretaps. Finally, in finding that the present affidavits established probable cause, I find that Officer Furman provided credible interpretations of the content of the conversations discussed in the pertinent affidavits. *See Bellomo*, 954 F.Supp. at 638 n.3. Accordingly, I find that there was probable cause to initiate and continue the wiretaps of TT10 and TT15 on December 21, 2021, January 13, 2022, and February 11, 2022.

### c.    *Whitney*

In the January 13, 2022 affidavit, Officer Furman recounted a text exchange between D. Mims and Whitney over TT10, which occurred on December 22, 2021.

(Doc. 278-3 at 29.)  In the text exchange, Whitney stated, "He gone wait to get more tomorrow still waitin on more bread but got tha rest he owes now tho." (*Id.*)  D. Mims responded, "Ight." (*Id.*)  Officer Furman interpreted this exchange to mean that Whitney was informing D. Mims an individual for whom Whitney was collecting drug proceeds was not able to pay at that time but would be able to pay the next day. (*Id.*)  Officer Furman also interpreted "bread" to mean cash collected. (*Id.*)  On December 27, 2021, investigators intercepted a call between Whitney and D. Mims over TT10. (*Id.* at 29-31.)  During the conversation, D. Mims informed Whitney, "I've got to leave tomorrow." (*Id.* at 30.)  Whitney responded, "Alright, you'll have it tonight." (*Id.*)  D. Mims responded, "Alright.  I'll come in there and handle some shit." (*Id.*)  Whitney and D. Mims also discussed what was going on with "Blood," i.e., Belton. (*Id.*)  Toward the end of the conversation, Whitney told D. Mims, "Alright let me know when you're on your way." (*Id.*)  Officer Furman interpreted the call to mean that D. Mims was contacting Whitney to verify the collection of drug proceeds. (*Id.*)  Officer Furman noted that, during the investigation, investigators had developed evidence that Whitney's role in the DTO was collection of money from distributors to be delivered to D. Mims or Belton. (*Id.* at 31.)  Further, Officer Furman noted that in April 2021, Whitney was intercepted multiple times on TT6, used by Rogers, regarding the collection of money for drugs. (*Id.*)  Officer Furman interpreted the call to mean that Whitney had money for D. Mims and D. Mims would meet with Whitney later that night to collect the money. (*Id.*)  Additionally, Whitney's phone, TT14, between December 20, 2021 and January 6, 2021, had 2 calls and 91 texts with Robert Bates, an individual know to have purchased methamphetamine from Belton. (*Id.* at 38.)

Based on the foregoing, and, when considering the totality of the circumstances, I find that the January 13, 2022 affidavit establishes probable cause, because the information in the affidavit establishes a fair probability that Whitney was committing the

59

Target Offenses and that Whitney was using TT14 in furtherance of the Target Offenses. *See Merrett*, 8 F.4th at 750. Furthermore, to the extent that Whitney complains that the intercepted conversations presented in the affidavit were ambiguous and speculative, lacking direct discussion of drugs or narcotics trafficking activities, I find such an argument to be without merit. A finding of probable cause "is not disturbed because many of the conversations were in vague or coded language. A court is justified in relying on an expert's opinion as to evidence in a wiretap application[.]" *United States v. Bellomo*, 954 F.Supp. 630, 638 n.3 (S.D.NY. 1997). I find that Officer Furman provided credible interpretations of the content of the conversations discussed in the affidavit. "It would defeat the purpose of the wiretap statute to allow criminals to avoid detection simply by using nicknames and code to disguise their activities." *Id*. Accordingly, I find that there was probable cause to issue the wiretap of TT14 on January 13, 2022.

In the February 11, 2022 affidavit, Officer Furman recounted that, on January 26, 2022, investigators intercepted a call between Whitney and Bates over TT14. (Doc. 278-4 at 30-31.) During the conversation, Bates asked Whitney, "Can you do half a jar or whatever you got?" (*Id.* at 30.) Whitney responded, "Yeah." (*Id.* at 31.) In response, Bates asked, "Alright, can I slide?" (*Id.*) Whitney responded, "Yeah, give me like 3 minutes." (*Id.*) Officer Furman interpreted Bates's call to Whitney to be Bates seeking to purchase drugs from Whitney. (*Id.*) Officer Furman interpreted "half a jar" to mean half of a pound of methamphetamine. (*Id.*) Officer Furman interpreted the remainder of the conversation to be Whitney telling him that he had drugs to sell to Bates and that Bates could meet him to make the purchase. (*Id.*) On February 1, 2022, investigators intercepted a call from an unidentified male to Whitney over TT14 in which the unidentified male sought to purchase marijuana from Whitney. (*Id.* at 31-32.) During the conversation, Whitney agreed to sell marijuana to the unidentified male. (*Id.*) On

60

February 6, 2022, investigators intercepted a call between Whitney and an unidentified female over TT14. (*Id.* at 35-36.) During the conversation, the unidentified female stated, "I need some of the[m] things, 100 of them things you got." (*Id.* at 35.) Officer Furman interpreted this to be the unidentified female asking Whitney if he had 100 pills to sell to her. (*Id.*) Whitney told the unidentified female that he did not know whether he had pills to sell, and she asked Whitney to check. (*Id.*) Approximately one hour later, the unidentified female called Whitney to see if he had checked about the pills and Whitney told her he did not have any pills. (*Id.* at 36.) Investigators also intercepted two calls over TT14, where an unidentified male arranged to purchase marijuana from Whitney. (*Id.* at 37-38.)

Like the January 13, 2022 affidavit, based on the foregoing, and, when considering the totality of the circumstances, I find that the February 11, 2022 affidavit established probable cause, because the information in the affidavit establishes a fair probability that Whitney was committing the Target Offenses and that Whitney was using TT14 in furtherance of the Target Offenses. *See Merrett*, 8 F.4th at 750. Because I found that the January 13, 2022 affidavit established probable cause, the information that investigators learned from the January 13, 2022 wiretap order was not derived from an illegal wiretap and therefore was properly considered in granting the February 11, 2022 wiretap. Finally, like the January 13, 2022 affidavit, in finding that this affidavit established probable cause, I find that Officer Furman provided credible interpretations of the content of the conversations discussed in the February 11, 2022 affidavit. *See Bellomo*, 954 F.Supp. at 638 n.3. Accordingly, I find that there was probable cause to continue the wiretap of TT14 on February 11, 2022.

## 2. *Necessity*

Belton, D. Mims, Whitney, and E. Mims all argue that the affidavits attached to the wiretap applications failed to establish that normal investigative procedures could not

have been used in lieu of wiretaps. Belton essentially argues that the investigative techniques discussed in the May 21, 2021 affidavit, the November 29, 2021 affidavit, the January 13, 2022 affidavit, and the February 11, 2022 affidavit that were not tried or were unsuccessful could have been tried against Belton or should have been tried against Belton in lieu of wiretapping his phone and continuing the wiretapping of his phone. (Doc. 256-1 at 16-25.) D. Mims essentially argues that most of the other investigative procedures discussed in the affidavits were not specifically attempted with regard to D. Mims. (Doc. 259-1 at 10-11.) Similarly, Whitney primarily argues that the other investigative procedures discussed in the January 13, 2022 affidavit and the February 11, 2022 affidavit were not specifically attempted as to him. (Doc. 244 at 21-26.) E. Mims, who acknowledges neither he nor his phone were the specific target of any of the wiretap applications (Doc. 245-2 at 2 n.1), seeks suppression of evidence obtained from the May 21, 2021, November 29, 2021, December 21, 2021, January 13, 2022, and February 11, 2022 wiretap orders because in the affidavits Officer Furman described "an investigation which was successfully using a wide variety of normal investigative techniques," which made the wiretaps unnecessary. (*Id.* at 8.)[12]

---

[12] E. Mims claims that he has standing to seek suppression of evidence obtained by the wiretap orders because he is an "aggrieved person" as defined by 18 U.S.C. § 2510(11). That is, "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." *Id.*; *see also* 18 U.S.C. § 2518(10)(a) ("Any aggrieved person . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter. . . .). E. Mims contends that he is an "aggrieved party" because he was a party to illegally intercepted communications over TT7, TT10, and TT13. (Doc. 245-2 at 2 n.1.) However, E. Mims acknowledges that none of the orders authorizing the wiretaps were directed at him. Further, while E. Mims claims that he was a party to intercepted communications over TT7, TT10, and TT13, there is no evidence in the record and E. Mims presents no evidence to establish that he was a party to any intercepted communications over TT7, TT10, and TT13. Thus, on the record before the Court, it appears E. Mims lacks standing to move to suppress evidence obtained from the wiretaps. Nevertheless, even if E. Mims could establish standing, as will be discussed in greater detail below, I find that the affidavits in support

At the outset, I make the following observations: (1) as discussed above, I have found that there was probable cause for the wiretap orders on Belton's phones, D. Mims's phones, and Whitney's phone; (2) at the time the wiretap applications and affidavits were filed, law enforcement was investigating a drug trafficking organization, involving among others (identified and unidentified), Belton, D. Mims, Whitney, and E. Mims as coconspirators in the DTO; and (3) the purpose of the wiretaps was to uncover evidence of the drug conspiracy and identity of coconspirators by gathering evidence related to the Target Offenses, the names, telephone numbers, and residences of associates of the Target Subjects and others unknown, including drug suppliers, transporters, financiers, manufacturers, distributors, and customers, leadership in the DTO, dates, times, and places for commission of the drug trafficking activities, locations and management of the narcotics and proceeds from narcotics sales, the nature, scope, and methods of the DTO, and the existence and location of records related to the distribution of drugs. (Doc. 278 at 5; Doc. 278-1 at 4-5; Doc. 278-2 at 4-5; Doc. 278-3 at 5-6; Doc. 278-4 at 5-6.)

In *United States v. Davis*, 882 F.2d 1334 (8th Cir. 1989), the Eighth Circuit found that the necessity requirements of § 2518(3)(c) were met because:

> The affidavit filed with the initial wiretap application explains at length why traditional investigative techniques had failed to provide needed information or were too dangerous or unlikely to succeed if tried, citing, for example, the difficulty of placing undercover agents into the conspiracy, the ineffectiveness of physical surveillance, the surreptitious conduct of the coconspirators, the danger posed to confidential informants, and the limited utility of toll records, financial statements, and pen registers.

*Id*. at 1344; *see also United States v. O'Connell*, 841 F.2d 1408, 1414-15 (8th Cir. 1988) (finding that "it was nearly impossible for the government to discover the full scope of

---

of the wiretap applications at issue in this case met the necessity requirement of 18 U.S.C. § 2518(c).

this drug conspiracy and the identities of participants without the use of wiretaps" and "[a]lthough the government had collected much evidence prior to the wiretap authorization, the magistrate found that this information revealed a large and far-flung conspiracy . . . which presented more difficult investigative problems than a common, 'small-time' narcotics ring"). Similarly, in *United States v. Thompson*, 210 F.3d 855 (8th Cir. 2000), the Eighth Circuit held that an affidavit is sufficient if it demonstrates that investigators employed or attempted other investigative techniques but such techniques "were insufficient to reveal the full conspiracy or the identity of several key conspirators." *Id.* at 859.

I find that the May 21, 2021 affidavit, the November 29, 2021 affidavit, the December 21, 2021 affidavit, the January 13, 2022 affidavit, and the February 11, 2022 affidavit all satisfy the necessity requirement of § 2518(c). Here, in the affidavits, Officer Furman outlines several investigative techniques that investigators employed to investigate the drug conspiracy. Investigators had used confidential sources, conducted controlled purchases, engaged in physical surveillance, executed search warrants, conducted interviews, performed or attempted to perform trash searches, used other electronic surveillance, including camera, pen registers, trap devices, and toll analysis, employed mail cover requests, and attempted financial investigation. (Doc. 278 at 56-73, 75-80, 82-94; Doc. 278-1 at 44-58, 60-68; Doc. 278-2 at 37-52, 54-62; Doc. 278-3 at 48-65, 67-76; Doc. 278-4 at 50-61, 63-70, 72-81.) Officer Furman also detailed the effectiveness and limitations of these investigative techniques. Further, Officer Furman explained why the use of undercover agents and grand jury subpoenas were not used and why such investigative techniques would likely be of limited value to the investigation. (Doc. 278 at 73-74, 80-82; Doc. 278-1 at 51-52, 58-60; Doc. 278-2 at 45-46, 52-54; Doc. 278-3 at 57-58, 65-67; Doc. 278-4 at 61-62, 70-72.) In the affidavits, Officer Furman concluded that electronic surveillance was likely the only means of investigation

to fully expose the overall scope and extent of the criminal organization under investigation. Officer Furman also stated that the methods of investigation discussed in the affidavits had limited success and appeared unlikely to succeed if tried or continued, or were too dangerous to employ, making the wiretaps the best method to achieve the goals of the investigation. (Doc. 278 at 94; Doc. 278-1 at 68-69; Doc. 278-2 at 63; Doc. 278-3 at 76-77; Doc. 278-4 at 82.) Accordingly, I find that May 21, 2021 affidavit, the November 29, 2021 affidavit, the December 21, 2021 affidavit, the January 13, 2022 affidavit, and the February 11, 2022 affidavit all met the necessity requirement of Section 2518(c). Indeed, because investigators had probable cause to believe that Belton, D. Mims, Whitney and E. Mims were all part of a complex drug conspiracy and drug trafficking organization, whether some of the investigatory techniques discussed above were not specifically employed as to Belton, D. Mims, Whitney, or E. Mims does not detract from the finding that the affidavits met the necessity requirement. *See Merrett*, 8 F.4th at 749 ("To meet the necessity requirement, law enforcement must 'establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator.") (Quotations omitted).

### 3. *Good Faith Exception*

"[E]ven if this Court was to find that the wiretap applications and affidavits did not contain probable cause, or failed to meet the necessity . . . requirements of 18 U.S.C. § 2518, the wiretap orders would be facially valid under the good-faith exception to the exclusionary rule as articulated in *United States v. Leon*, 468 U.S. 897, 922 (1984)." *United States v. Ballard*, No. 17-318 (SRN/FLN), 2018 WL 3249772, at *4 (D. Minn. June 18, 2018). Contrary to Whitney's contention, *see* Doc. 244 at 17-18, the *Leon* good faith exception applies to wiretap authorizations in the same manner that it applies to traditional search and seizure warrants. *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994). In *Moore*, the Eighth Circuit explained that:

> *Leon* of course dealt with the judicially developed exclusionary rule for Fourth Amendment violations, whereas we deal here with a statutory exclusionary rule imposed for a "violation of this chapter." However, § 2518(10)(a) is worded to make the suppression decision discretionary ("If the motion is granted"), and its legislative history expresses a clear intent to adopt suppression principles developed in Fourth Amendment cases. *See* S.Rep. No. 1097, 1968–2 U.S.C.C.A.N. at 2185. Therefore, we conclude that the subsequently-developed *Leon* principle applies to § 2518(10)(a) suppression issues.

41 F.3d at 376. Therefore, *Leon* is applicable where law enforcement officers act reasonably and comply "with the core statutory requirements of federal wiretap law in applying for and executing the wiretap orders." *Id*. at 376-77; *see also United States v. Terrell*, No. CR15-3051-MWB, 2016 WL 3920236, at *13 (N.D. Iowa July 18, 2016) ("The Eighth Circuit Court of Appeals has held that the *Leon* 'good faith doctrine' applies to wiretap orders when law enforcement officers rely in good faith on a deficient wiretap order"); *United States v. Peoples*, No. 15-165 (32) (JRT/LIB), 2016 WL 162841, at *2 (D. Minn. Apr. 25, 2016) (applying the *Leon* good faith exception to a wiretap challenging the necessity requirement for the wiretap); *United States v. Dubose*, No. 08-232 (08) (MJD/AJB), 2009 WL 10678869, at *3 (D. Minn. July 21, 2009) (applying the *Leon* good faith exception to a wiretap challenging the probable cause and necessity requirements for the wiretap); *United States v. Jackson*, No. CR00-2032, 2001 WL 34149358, at *3 (N.D. Iowa Sept. 28, 2001) ("Even if there was some defect in the issuance of the wiretap order the *Leon* good faith exception to the exclusionary rule applies.").

"In *Leon*, the Supreme Court held that the Fourth Amendment exclusionary rule does not require the suppression of evidence seized by the police pursuant to a search warrant which was sought, obtained, and executed in objectively reasonable good faith, but which was held, subsequently, to have been issued without probable cause. *United*

States v. Lomeli, 676 F. 3d 734, 742 (8th Cir. 2012); *see also United States v. Puckett*, 466 F.3d 626, 629 (8th Cir. 2006) ("Even if a search warrant is deemed invalid, evidence obtained pursuant to the warrant is not automatically suppressed. Such evidence is admissible when it is objectively reasonable for a police officer to have relied in good faith on the issuing judge's probable-cause determination."). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *Puckett*, 466 F.3d at 630 (internal quotations and citations omitted) (alteration in original). An officer's reliance on a warrant may be said to be objectively unreasonable under the following four circumstances: "(1) when there is a *Franks* violation; (2) when an issuing judge has 'wholly abandoned his [or her] judicial role'; (3) when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant; and (4) when the warrant is 'so facially deficient' that no police officer could reasonably presume the warrant to be valid." *Id.*

I find that the investigators relied on the wiretap orders in good faith. There is no evidence that Officer Furman included false information in the supporting affidavits. There is no evidence that Judge Williams abandoned his judicial role. There is no evidence that it would be entirely unreasonable to believe that the affidavits provided probable cause. There is no evidence that the wiretap applications and supporting affidavits were "so facially deficient" that it would be objectively unreasonable for investigators to rely on them. Accordingly, even if the wiretap applications and affidavits were deficient, *Leon* is applicable, and the evidence obtained from the wiretap orders should not be suppressed.

### 4. *Fruits of the Wiretaps*

Whitney argues that a search of his residence, the seizure and testing of his urine, and statements he made to law enforcement after the search of his residence should all be

suppressed as being derived from the unlawful wiretaps. (Doc. 244 at 18-20.) Belton seeks to suppress "any evidence that was gathered or seized derivatively as a result of the wiretap." (Doc. 256 at 2.) E. Mims and D. Mims similarly seek suppression of evidence derived from the wiretaps. (Doc. 245-1, Doc. 259 at 2.)

Normally, I would address certain alternatives to anticipate the possibility that the Court may disagree with my recommendations with regard to any or all of the wiretap orders. However, in the instant case, I find it impractical to do so. For example, it is possible the Court will disagree with my recommendations on one or more of the wiretap orders, but not on others. Thus, the permutations regarding what evidence may be inadmissible with regard to the several defendants could be quite complex. Moreover, at this stage, none of the parties addressed what evidence may be tainted if one or more wiretap orders is determined to be defective. Thus, at this stage, it would be difficult, at best, to trace any fruit back to any particular tainted wiretap without further input from the parties.

Therefore, if the Court disagrees with me regarding the existence of probable case, the necessity of the wiretaps, or the *Leon* exception on one or more of the orders, it may be necessary to refer the matter back to me for additional argument or perhaps a hearing to determine what evidence is admissible in light of the Court's ruling.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendants' Motions to Suppress. **(Docs. 241, 245, 256, 259.)**

**To allow for an expedited final ruling,** objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) must be filed within **SEVEN (7) days** of the service of a copy of this Report and Recommendation. *See United States v. Vasquez-Martinez*, No. 6:05CR60016-001, 2006 WL 376474, at *8 (W.D. Ark. Feb.

9, 2006) (seven days for objections); *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 925 (D. Minn. 2018) (referral order included order for expedited review of R. & R.).

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 10th day of January, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa